## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |
|---|---|
| RYAN L. APRILL, an individual, and THOMAS S. APRILL, an individual, | |
| Plaintiffs, | |
| vs. | |
| ANTHONY AQUILA, AQUILA FAMILY VENTURES, LLC, AFV FOUNDERS SELECT CAPITAL PARTNERS LLC, a/k/a AFV PARTNERS LLC, AFV MANAGEMENT ADVISORS LLC, AFV FSCP CO-INVESTMENT I LLC, a/k/a AFV PARTNERS CO-INVESTMENT I LLC, | Case No. 20 CV _____ |
| | **JURY TRIAL DEMANDED** |
| Defendants. | |

## COMPLAINT

Ryan L. Aprill and Thomas S. Aprill (collectively "Plaintiffs"), complain against defendants Anthony ("Tony") Aquila, Aquila Family Ventures, LLC, AFV Founders Select Capital Partners LLC a/k/a AFV PARTNERS LLC, AFV Management Advisors LLC, AFV FSCP Co-Investment I LLC a/k/a AFV Partners Co-Investment I LLC, (collectively "Defendants"), and in support thereof state as follows:

## NATURE OF THE CASE

1.     This is a claim for breach of employment contract, violations of the Illinois Wage Payment and Collection Act, breach of fiduciary duty, promissory estoppel, unjust enrichment, fraudulent inducement and equitable estoppel.

2.     At all relevant times defendant Tony Aquila ("Aquila") served as the founder, president, and controlling member and/or manager of each of the Defendant entities. Aquila holds himself out as

an entrepreneur that has been involved in over 70 transactions worth more than $15.0 billion in transaction value, including selling the company he founded, Solera Holdings, Inc. ("Solera") in 2016 to Vista Equity Partners, a leading private equity firm for approximately $6.5 billion in a public to private transaction. Plaintiffs reasonably reposed a special trust and confidence in Aquila which enabled him to lure them to leave their successful careers and to dedicate themselves to work on Aquila's behalf based on his many false representations and promises, without being paid a dime in promised compensation for their efforts over the course of nearly a year of employment. Plaintiffs were recruited by Aquila to work for his family of business entities and to assist Aquila form a new technology-focused private equity fund to which he pledged to invest $100 million of his own funds, with offers of executive level compensation, significant bonus payments and equity interests in various investment vehicles, which was all, as it turns out, a ruse.

3. In reliance on Aquila's offers of employment and his superior resources, information and experience, Plaintiffs gave up lucrative employment positions to devote their full-time efforts working for Aquila and the Defendant entities and they were critical and central to raising, investing and creating hundreds of millions of dollars of value. However, Aquila and the Defendant entities intentionally and in bad faith ignored their employment agreements, refused to pay Plaintiffs the compensation they were promised and failed to award them the equity interests worth millions of dollars to which they were entitled and earned.

4. By this complaint Plaintiffs seek damages and other relief to recover the compensation they earned and were entitled to under their employment contracts and other damages.

## PARTIES

5. Ryan L. Aprill ("Ryan") is a resident of the State of Illinois and resides at 1210 S. Indiana, Ave., Chicago, Illinois.

6.      Thomas S. Aprill ("Tom") is a resident of the State of Illinois and resides at 1253 W. Diversey Parkway, Chicago, Illinois.

7.      Aquila is a resident of the State of Texas and resides at 1607 Enclave Ct., Southlake, Texas.

8.      Aquila Family Ventures, LLC ("AF Ventures") is a limited liability company formed under the laws of the State of Texas, with its principal place of business located at 2126 Hamilton Road, Suite 260, Argyle, Texas.

9.      AFV Founders Select Capital Partners LLC a/k/a AFV Partners LLC ("AFV Partners"), is a limited liability company formed under the laws of the State of Delaware, with its principal place of business located at 2126 Hamilton Road, Suite 260, Argyle, Texas.

10.     AFV Management Advisors LLC ("AFV Management"), is a limited liability company formed under the laws of the State of Delaware, with its principal place of business located at 2126 Hamilton Road, Suite 260, Argyle, Texas. AFV Management is the Manager of AFV Partners.

11.     AFV FSCP Co-Investment I, LLC a/k/a AFV Partners Co-Investment I LLC, ("FSCP Co-Investment I") is a limited liability company formed under the laws of the State of Delaware, with its principal place of business located at 2126 Hamilton Road, Suite 260, Argyle, Texas.

12.     No member or shareholder of the defendant entities is citizen of the State of Illinois.

### NON-PARTY AFFILIATED ENTITIES

13.     AFV Founders Select Capital Partners SPV-1 LLC ("SPV-1"), is a foreign limited liability company formed under the laws of the Cayman Islands, with its principal place of business located at 2126 Hamilton Road, Suite 260, Argyle, Texas.

14.     AFV Founders Select Capital Partners SPV-2 LLC ("SPV-2"), is a limited liability company formed under the laws of the State of Delaware, with its principal place of business located at 2126 Hamilton Road, Suite 260, Argyle, Texas.

15.     AFV Partners SPV-3 LLC ("SPV-3"), is a limited liability company formed under the laws of the State of Delaware, with its principal place of business located at 2126 Hamilton Road, Suite 260, Argyle, Texas.

16.     Merula Holdings, LLC ("Merula"), is a limited liability company formed under the laws of Delaware, with its principal place of business located at 2126 Hamilton Road, Suite 260, Argyle, Texas.

17.     APG Holdings, LLC ("APG Holdings"), is a limited liability company formed under the laws of the State of Delaware, with its principal place of business located at 2126 Hamilton Road, Suite 260, Argyle, Texas.

18.     Aircraft Performance Group LLC ("APG") is a limited liability company formed under the laws of the State of Delaware, with its principal place of business located at 4348 Woodlands Blvd. Suite 200, Castle Rock, Colorado.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction to hear this matter pursuant to 28 U.S.C. §1332 as the Plaintiffs are citizens of the State of Illinois.  Defendants are all foreign corporations with principal places of business located outside of Illinois.  No member or shareholder of the defendant entities is citizen of the State of Illinois.  Therefore, complete diversity of citizenship exists.

20.     The amount in controversy exceeds $75,000, exclusive of interest and costs.

21.     Venue in the Northern District of Illinois is proper pursuant to 28 U.S.C. §1391 as Defendants transacted business in Illinois and a substantial part of the events on which the claims

asserted herein occurred in this District and the subject employment contracts were entered into in the Northern District of Illinois.

## FACTS COMMON TO ALL COUNTS

22.     Prior to his employment with AFV Partners and its affiliates, Ryan was employed as Vice President of Chaifetz Group, the private investment firm of successful entrepreneur and billionaire Dr. Richard A. Chaifetz, where he served as a senior private equity and investment professional.  Ryan has extensive education, knowledge and expertise in mergers, acquisitions and other types of investment related transactions and structures. Ryan holds a law degree, is licensed to practice law in Illinois and holds a Master of Business Administration from the University of Chicago and a Masters of Law from Northwestern Pritzker School of Law.

23.     In about August 2018 Ryan was first introduced to Aquila. Thereafter in about April 2019, Ryan was actively recruited by Aquila, who held himself out as an experienced, wealthy and successful technology entrepreneur and at the time Chief Executive Officer of Solera, a global technology company, to join with him in co-founding a new private equity firm identified as AFV Partners.

### *Aquila Forms AFV Partners.*

24.     The business plan for AFV Partners was to raise money from institutional-sized family offices, pension and global sovereign wealth funds to invest in dynamic technology businesses with the goal of growing those businesses, selling them and/or taking them public and reaping the financial benefits and profits of doing so.  At that time, Aquila committed to invest $100 million in AFV Partners, and represented to Ryan that a family member of one of the wealthiest families in the country ("Investor 1"), was also a co-founding investor in the firm alongside his $100 million commitment.

25.     The investments were to be made directly through an innovative holding company structure and indirectly through a variety of other investment vehicles and structures, with some of the world's largest and most sophisticated investors, employing special purpose vehicles, like SPV-1, Merula, SPV-2 and SPV-3 (collectively "the SPVs").

26.     Private equity firms like AFV Partners customarily compensate principals and other key employees, through a combination of salary, bonus, and "carried interest." "Carried interest" is the private equity firm's own equity stake in the companies and investment vehicles in which it invests funds contributed by its investors.  Principals like Ryan are awarded at the outset of the investments a percentage in the private equity firm's carried interest.

27.     Aquila is the President and Managing Member of AFV Partners and AFV Management. Aquila is also the president, controlling member and/or manager of each of the other Defendant entities and their affiliates.

28.     Prior to forming AFV Partners, Aquila served as founder and Chief Executive Officer of Solera and its affiliates ("Solera Group"). Aquila holds himself out as an entrepreneur that has been involved in over 70 transactions worth more than $15.0 billion in transaction value.  In 2016 the Solera Group was sold to Vista Equity Partners, a leading private equity firm for approximately $6.5 billion in a public to private transaction.  In June 2019 Aquila publicly announced his departure as Chief Executive Officer from Solera Group.  At such time, Aquila represented to Ryan that his departure from Solera Group was voluntary. Ryan later learned through public allegations that Aquila was terminated by Solera Group for cause.

29.     In February 2019, Aquila was appointed as the Global Chairman of the Board of Directors of Sportradar.  Sportradar, together with its subsidiaries and affiliates, is a leading global provider of sports data and intelligence and is the official partner of the NBA, NFL, NHL and NASCAR

as well as FIFA and UEFA. In his position as Global Chairman, one of Aquila's goals was to raise new capital to invest in Sportradar. Prior to joining AFV Partners, Aquila represented to Ryan that through Aquila's position as Chairman, he stood to obtain a personal equity stake in Sportradar in exchange for investing or syndicating approximately €50.0 million euro before the end of 2019.

30.     Aquila solicited and actively recruited Ryan to join AFV Partners to assist him in locating new investors for the purposes of investing in Sportradar and pursuing other prospective investments.

31.     Aquila also recruited several former executives of Solera Group to assist him in setting up his new private equity venture. Those executives included: Renato Giger, (Aquila's long-time Chief Financial Officer) ("Giger"), Andy Balzer (Head of Innovation) and Michael Horvath (Chief of Staff). Aquila also recruited Dr. Kurt Lauk, a member of Solera Group's board of directors and former member of European Parliament and Ken Manget, former Global Head of Relationship Investing at Ontario Teachers' Pension Plan. During the spring of 2019, Ryan attended several meetings with Aquila and his executive team in connection with their efforts to recruit Ryan to join their new private equity venture.

32.     In about June of 2019, Aquila represented to Ryan that he secured a $30 million investment from Investor 1 to help fund the launch of AFV Partners. At this time, Ryan began collaborating on potential investment structures and strategies with Aquila and his executive team.

33.     In July 2019, Ryan attended a meeting at a Chicago investment bank with Aquila and Giger to discuss the potential acquisition of a several hundred million dollar division being sold by a Fortune 100 company. After the meeting, Aquila and Ryan discussed the idea of Ryan joining the new venture on a full-time basis as a co-founding member, the investment opportunity and inviting Ryan to attend an upcoming Sportradar meeting in Las Vegas.

34.     On July 21-22, 2019 Ryan attended the Sportradar meeting in Las Vegas and Ryan met with Aquila one-on-one multiple times to continue the discussion regarding the potential investment in Sportradar, and related transaction structure and strategy, which would yield Aquila a valuable equity stake in Sportradar.  They also had ongoing discussions and negotiations regarding having Ryan joining the new venture as a co-founding member. Aquila asked Ryan to resign from his current employment as soon as possible to help him close the contemplated investment in Sportradar.

35.     On August 2, 2019, Giger sent Ryan an initial spreadsheet detailing their collective discussions with Aquila regarding compensation mechanics. The purpose of this email was to identify each co-founding member's cash compensation and carried interest. Ryan's proposed annual base salary was $250,000, with an increase to $350,000 when AFV Partners' closed their first investment. Ryan's share of the proposed carried interest was targeted at $15.9-$18.0 million.

### *Ryan Aprill Is Hired As A Principal For AF Ventures And AFV Partners.*

36.     On or about August 4, 2019, Ryan had a phone conversation with Aquila wherein they finalized their discussions regarding Ryan joining AFV Partners as a co-founding member and the call ended with Aquila offering Ryan full-time employment as a Principal with AF Ventures and its affiliates, with a starting annual salary of $250,000 and an increase to $350,000 when they closed their first investment or bought their first company, plus bonus and a percentage in the firms' carried interest in its investments. During the call, Ryan reiterated that he was only willing to leave his current employment at Chaifetz Group if he was granted a carried interest allocation consistent with what is customary for a co-founder in a new private equity fund. The parties agreed and Aquila instructed Ryan to finalize payroll and employment documents with Lori McCutcheon, the CFO of AF Ventures.

37.      On August 5, 2020, Ryan received a letter from Lori McCutcheon outlining the terms of the employment offer from AF Ventures.  The terms of the offer contemplated that Ryan's

employment agreement would be assigned by AF Ventures to AFV Founders Select Capital Partners LLC, now known as AFV Partners. That same day Ryan sent to Lori McCutcheon his proposed revisions to the employment offer, which included his entitlement to a percentage of carried interest as part of his overall compensation package.

38.    In the evening of August 5, 2019, Lori McCutcheon accepted Ryan's revisions and the parties' contract was formed.

39.    The agreed offer letter was never tendered to Ryan for signature.

40.    On August 6, 2019, in reliance on the employment agreement and the representations of Aquila, Lori McCutcheon and Giger, Ryan resigned from his employment with Chaifetz Group, sacrificing a substantial compensation package and economic prospects in order to join Aquila and AFV Partners.

41.    On August 7, 2019, Ryan commenced his formal employment with AFV Partners and established a home office in Chicago, Illinois which became his primary workplace. Also, on August 7, 2019, Lori McCutcheon sent payroll forms to Ryan to fill out and return by August 9, 2019.

42.    On August 9, 2019, AFV Partners closed a $50 million investment from Investor 2. The investment proceeds were used to invest in Sportradar through SPV-1. Ryan was central to structuring and negotiating all aspects of the investment. Thereafter, Ryan became an observer of the board of directors of Sportradar, and attended meetings and events involving Sportradar business.

43.    On August 13, 2019, shortly after commencing his employment with AFV Partners, Ryan, Aquila and the other co-founders, Giger, Ken Manget and Michael Horvath met as a team in a conference room at the Chicago law offices of Mayer Brown. The issue of payroll and compensation was discussed and Aquila became hostile with Ryan and the other co-founders. At the meeting Aquila

9

attempted to retract the terms of Ryan's employment agreement, and demanded that Ryan have "*skin in the game*" in order to receive his promised carried interest.

44.     At that meeting Aquila demanded, for the first time, that in order to have "*skin in the game*," any money paid to Ryan and the other co-founders be treated as loans and not salary, at least until the parties completed their first acquisition.  He also demanded that all loans be secured by the carried interest allocated to each of the co-founding members. While no agreement was reached, Aquila promised to formalize the terms of any loans and the carried interest vehicle.

45.     Notwithstanding the representations of Aquila, the terms of Ryan's employment agreement, and the fact that AFV Partners and AF Ventures both obtained Payroll Protection Loans, no salary payments were made to Ryan or any of the other co-founding members by AFV Partners or AF Ventures.

### *Formation of FSCP Co-Investment I as Carried Interest Vehicle.*

46.     Additionally, Aquila failed to invest any of the $100 million he personally committed to invest in AFV Partners.  Aquila also used a portion of the initial capital contributed by other investors for his own personal benefit, including repairing and operating his Gulfstream jet.

47.     On or about September 18, 2019, largely through Ryan's efforts, AFV Partners raised an additional €73 million euro from another investor and used the proceeds to invest in Sportradar through Merula Holdings and SPV-2. That same day, Aquila instructed Ryan to send an e-mail to the law firm of Michelman & Robinson, outlining the terms of the carried interest vehicle and directing them to prepare the formal documents.  Aquila insisted that the carried interest vehicle be the same entity making the loans to the co-founding members, so that the loans would be secured by their equity interests.  That entity is identified as FSCP Co-Investment I.

10

48. Thereafter, Michelman & Robinson timely prepared the formation documents for the carried interest vehicle which separated the equity interests in FSCP Co-Investment I into Class A Units and Class B Units. Those documents included the FSCP Co-Investment I Operating Agreement ("Operating Agreement"), FSCP Co-Investment I Contribution Agreement ("Contribution Agreement"), FSCP Co-Investment I Class B Unit Award Agreement ("Class B Award Agreement") and the FSCP Co-Investment I Confidential Information, Invention Assignment and Arbitration Agreement ("Confidentiality Agreement"), collectively referred to as (the "Carried Interest Documents").

49. Pursuant to the Contribution Agreement, AFV Partners agreed to contribute its ownership of 300,000 Common Units in SPV-1 along with its 100% equity interest in SPV-2 to FSCP Co-Investment I, collectively ("Contribution") in exchange for the Class A Units in FSCP Co-Investment I. (*See attached* Ex. 1).

50. Class B units in FSCP Co-Investment I were to be allocated to the other co-founding members, including Ryan, in exchange for services provided to the company and its affiliates. The terms and conditions of the Class B Units were to be governed by the Class B Award Agreement which provided for distributions, restrictions and vesting of Class B Units ("Class B Award Agreement"). (*See attached* Ex. 2).

51. Based on the discussions between the parties, Class A units were to be allocated to Aquila through AFV Partners, and the remaining Class B Units were to be allocated to the co-founding members Renato Giger, Ryan Aprill, Michael Horvath, Ken Mange, Andy Balzer and Tom Aprill.

52. According to the Class B Award Agreement, Class B Units allocated to Ryan and the other co-founding members were to vest as follows: 20% of the Class B Units shall be vested immediately as of the date of the grant; and the remaining 80% shall vest in the amount of 2.222% on

the last day of each calendar month for the three-year period following the grant date. (Ex. 2, at Ex. A).

### *Loan Agreements with FSCP Co-Investment I.*

53.     On September 20, 2019, in reliance upon the terms of the Carried Interest Documents and the representations of Aquila regarding Ryan's entitlement to a share of the carried interest in the form of Class B Units, Ryan executed the first of three (3) Secured Promissory Notes with FSCP Co-Investment I in the amount of $100,000 ("Promissory Note 1"). The Note was to be secured by a first priority security interest in Ryan's equity interest in FSCP Co-Investment I. (*See attached* Ex. 3).

54.      Thereafter, Ryan continued to devote his full time efforts working for AFV Partners as a senior level executive in all areas of its business, and led all aspects of due diligence, negotiations and transaction execution for AFV Partners' acquisition of Aircraft Performance Group ("APG") from Liberty Hall Capital Partners, including raising all of the equity and debt necessary to consummate the transaction.

55.     After acquiring APG, Ryan became an officer of APG, was appointed to its board of directors and was actively involved in all aspects of the day-to-day operations and management of APG.

56.     On or about October 31, 2019, Ryan and Aquila met to discuss Ryan's total compensation package, including the amount of his promised carried interest allocation. Aquila agreed to use the 2018 Heidrick & Struggles ("H&S") compensation report and methodology as the basis for establishing Ryan's total compensation including salary, bonus and carried interest and Ryan also agreed. At that meeting Aquila represented to Ryan that his total compensation package, including carried interest, would be commensurate with that of a "Principal" for a fund size of $500M - $749M as set forth in the H&S report. Based on that report, Aquila agreed that Ryan's annual salary would be

set at $236,000, annual bonus at $234,000 and his carried interest allocation would be valued at $4,612,000, subject to future appreciation based on investment performance.

57.     At that meeting, with the exception of Giger's annual base salary and bonus, Aquila represented that he would use the same H&S report values and methodology to establish annual compensation and carried interest allocations for the other co-founders as well.

58.     Aquila's representations as to compensation and carried interest are reflected in the budget prepared by Giger dated 11/24/19, as well as subsequent budgets. Cash compensation was projected to start in March 2020, retroactive to July 1, 2019 in Ryan's case.

59.     Despite repeated promises of payment of compensation by Aquila, neither AF Ventures nor AFV Partners paid any salary or bonuses to Ryan, and Aquila failed to finalize and execute the Carried Interest Documents allocating the Carried Interest to Ryan and the other co-founding members.

60.     In or about November 2019, at Aquila's direction, Ryan negotiated a Consulting Services Agreement with one of the largest family owned investment companies in Texas for a consulting project undertaken by Aquila through a wholly owned affiliate of AFV Partners. Despite AFV Partners' not being in the business of providing consulting services, Aquila represented to the client he had the required expertise to complete the consulting project and had the stated goal of securing a potential future investment in AFV Partners from the client. AFV Partners received an approximate $3.0 million retainer for the consulting work and collected on consulting time billed for Ryan and Tom over the course of the project, despite never paying them any of their promised compensation.

61.     On January 2, 2020, Ryan executed a second Secured Promissory Note with FSCP Co-Investment I in the amount of $100,000 ("Promissory Note 2"). This Note was also secured by a first priority security interest in Ryan's equity interests in FSCP Co-Investment I. (*See attached* Ex. 4). In

connection with Promissory Note 2, Aquila promised and represented that AFV Partners' carried interest in APG would also be contributed to FSCP Co-Investment I, increasing the value of Ryan's and the other co-founders' Class B Units.

62.     On January 3, 2020, AFV Partners closed the acquisition of APG through SPV-3.

63.     Despite Aquila's representations, AFV Partners' carried interest in APG was not contributed to FSCP Co-Investment I and is currently owned by AFV Management.

64.     Shortly after the acquisition of APG, Ryan met with Aquila and Giger at APG's office in Denver, Colorado, at which time Aquila advised him and Giger that he wanted to push back the starting date for payment of compensation to April 1, 2020. As of this date, despite repeated promises, Aquila had still not finalized or executed the Carried Interest Documents or contributed any of the promised equity interests to FSCP Co-Investment I.

65.     In March 2020, AFV Partners completed the acquisition of United Kingdom based RocketRoute Ltd.  Ryan was central to completing the transaction and immediately joined its board of directors along with Aquila and Giger. Ryan remains listed on the United Kingdom's Companies House website as an active director of RocketRoute's affiliated U.K. entities, AFVP Holdings I Ltd. and Aviantis Ltd.

66.     Shortly thereafter and through May 2020, Aquila directed Ryan and other AFV Partners' employees to begin moving certain full-time positions at APG in Castle Rock, Colorado to AF Ventures and AFV Partners in Argyle, Texas, to jointly serve the needs of APG and Aquila's personal real estate investments. Ryan became increasingly concerned about the practicality of this arrangement, the potential negative impact on APG's business and the conflicts of interest this could create with AFV Partners' investors and in connection with AFV Partners' pending investment advisor registration.

67.     Aquila gave further directives to defer compensation earned by APG employees and refused to pay outstanding transaction fees owed to certain law firms and other vendors.    Ryan raised these concerns with Aquila and Giger, but such concerns were dismissed.

68.     On or about April 1, 2020, Ryan confronted Aquila about the slow-down in the economy related to COVID-19, the extensive delays in payment of compensation, contribution of the promised equity interests to FSCP Co-Investment I and finalization and execution of the Carried Interest Documents. Ryan expressed his concern over AFV Partners failure to pay the agreed compensation and his need for regular income.

69.     Aquila reacted negatively to the conversation, became verbally hostile and accused Ryan of not trusting him.  Thereafter, Aquila attempted to convince Ryan to accept a lower salary than previously agreed and committed to finalizing the carried interest grants.  Ryan rejected Aquila's proposal to accept a reduction in salary.

70.      On April 21, 2020, having worked almost a year without payment of any compensation, Ryan agreed to execute a third Secured Promissory Notes with FSCP Co-Investment I in the amount of $100,000 ("Promissory Note 3"), in reliance on Aquila's representation that he would satisfy the promised salary and carried interest immediately after finalizing their collective efforts on a project they were working on. (*See attached* Ex. 5).

**_Termination of Ryan Aprill's Employment with AFV Partners._**

71.     On or about May 15, 2020, Ryan and Aquila reviewed the value of AFV Partners current investments and the aggregate estimated value of the firm's carried interest.  Based on assumptions provided by Aquila, their collective analysis supported a fair market value of AFV Partners' total carried interest as high as approximately $250.0 million.

72.     On or about May 21, 2020, Ryan received inquiries from an investor regarding the status of AFV Partners' financial budget and Aquila's commitment to invest $100 million in AFV Partners and the SPVs alongside their investments. After reviewing AFV Partners' current financial statements, Ryan learned that AFV Partners had been paying Aquila's personal Gulfstream expenses without reimbursement.

73.     As a result, Ryan grew concerned over Aquila's failure to satisfy any portion of his commitment and related representations he made to investors, his use of company resources for his own benefit and his lack of adherence to corporate formalities at APG.

74.      On or about May 23, 2020, Ryan's personal attorney contacted Aquila over the company's failure to pay Ryan his agreed upon compensation and his failure to execute the Carried Interest Documents.  While Aquila assured Ryan's attorney his compensation would be paid, and the carried interest would be documented by August 2020, Aquila reacted negatively to the phone call.

75.     That evening Aquila called Ryan and told him that AFV Partners may be the wrong environment for Ryan to work.  Aquila offered to have FSCP Co-Investment I forgive its loans to Ryan, and the parties go their separate ways.  Ryan rejected that proposal and demanded the agreed upon cash compensation and carried interest allocation.

76.     Aquila instructed Ryan to prepare for an important presentation to key investors in AFV Partners which was scheduled to take place on May 27, 2020.  Ryan spent the Memorial Day weekend preparing the presentation and sent it to Aquila.  Shortly thereafter, Aquila removed Ryan's e-mail calendar invite and told him the presentation was cancelled and not rescheduled.

77.     On May 29, 2020, Ryan sent a demand letter, through his attorney, to Aquila and AFV Partners for payment of his cash compensation and carried interest.

78. On June 2, 2020, Ryan attended a Sportradar board meeting and during the meeting Aquila e-mailed Ryan requesting that Ryan leave the meeting. Immediately thereafter, Aquila terminated Ryan's employment without cause.

79. Despite repeated demands, Aquila and AFV Partners failed to pay Ryan his agreed upon, salary, bonus or the value of his carried interest.

80. The equity interest in FSCP Co-Investment I to which Ryan is entitled is currently estimated to be valued between $8.0 million and $22.0 million, subject to appreciation based on the performance of Sportradar and other investments contributed to FSCP Co-Investment I.

81. On or about June 19, 2020, Ryan received a payment of the net amount of $190,490.92, after he had incurred substantial attorneys' fees to obtain a portion of what he is indisputably owed. The payment came from an unknown entity identified as Anthony Aquila Sole MBR.

82. Beginning in the spring of 2019 and continuing until his wrongful termination in June 2020, Aquila relied on and benefited from Ryan's expertise and efforts and Aquila identified Ryan as an employee and co-founding member of AFV Partners to investors and other third parties. The firm successfully raised over a quarter of a billion dollars from investors and invested those funds in dynamic technology businesses. Ryan played a key and essential role in creating and marketing the new venture to some of the world's largest and most sophisticated institutional investors, creating valuable intellectual property, operating and overseeing its businesses and investments, identifying and selecting prospective companies to invest in, executing investments, negotiating with investors and building key relationships and goodwill worth millions.

83. In large part due to Ryan's efforts, the value of AFV Partners' carried interest is currently worth upwards of $250.0 million and is growing in value. Additionally, by completing the

investments in Sportradar, Ryan assisted Aquila in earning a valuable equity stake in Sportradar. Without Ryan's assistance none of this would have been achieved.

84. Despite these efforts and significant accomplishments, and the terms and conditions of Ryan's employment and representations and promises made to him and the trust and confidence justifiably placed in him, Aquila, AF Ventures and AFV Partners have refused to pay Ryan the promised salary or any bonus at all, have refused to finalize and execute the Carried Interest Documents, and have failed to adequately compensate him for his efforts. The unwarranted delay in executing the Carried Interest Documents has caused significant economic harm to Ryan as its value continues to rise over time and the appreciation that rightfully belongs to Ryan is being withheld.

### *Tom Aprill Hired as Head of Human Resources for AFV Partners.*

85. Tom Aprill is the father of Ryan Aprill.

86. Tom previously served as a Partner at Heads International, a global executive search firm. On about August 30 2019, Tom left Heads International to join DHR International as a Partner serving their Technology and Business Consulting Practice. Prior to his employment at Heads International, Tom held a senior level position at Accenture.

87. Tom was first introduced to Aquila in August 2018 at a business dinner in San Francisco, California requested by Aquila. Tom began working for Aquila as a consultant in October 2018, when Heads International was retained by Solera Group to perform an executive search.

88. On or about April 19, 2019, Tom was contacted by Aquila regarding joining the new venture he was planning, AFV Partners.

89. On or about June 14, 2019, Tom was contacted again by Aquila on behalf of AFV Partners, to inquire if Tom was interested in a temporary or permanent employment position at AFV Partners. No agreement was reached by the parties at that time.

90.     In November of 2019, Aquila contacted Tom for a third time to discuss hiring Tom for approximately 9-12 months to recruit employees to work for AFV Partners and its other companies.

91.     On November 25, 2019, Tom traveled to Dallas, TX to meet with Aquila and one of its clients, a Texas based billionaire, to discuss staffing needs for a technology consulting engagement undertaken by AFV Partners.  After that meeting, Tom informed Aquila that he was not interested in a short-term employment contract as he was employed full-time by DHR International at that time.

92.     Aquila showed Tom the Heidrick & Struggles compensation report and advised him that if he came to work for AFV Partners, he would be considered a Vice-President level executive and would receive a commensurate base level salary, bonus and carried interest allocation as part of his compensation.

93.     Aquila then offered Tom a full-time position as the head of Human Resources for AFV Partners and its other companies.  Aquila offered Tom an annual salary of $164,000, an annual bonus of $155,000, and a carried interest allocation with a value of approximately $1.5 million (subject to future appreciation based on investment performance) based on the H&S report and methodology. Tom's resulting equity interest in FSCP Co-Investment I based on the proposed contribution is currently valued between $2.5 million and $7.5 million, and continues to increase in value.

94.     In reliance on Aquila's offer of employment with AFV Partners, Tom resigned his position as a partner with DHR International and accepted Aquila's employment offer.

95.     Tom began his employment with AFV Partners effective November 25, 2019, and worked on average over 80 hours per week attempting to fill the human resource and staffing needs of AFV Partners and its related companies.   Tom provided substantial services including but not limited to serving as the Head of Human Resources for AFV Partners, AF Ventures, APG and all of their related entities, which included designing and implementing all HR functions, conducting market

intelligence for benefits programs, processing employee bonus payouts for 2019, salary reviews and recommendations, recruitment activity, monthly employee reviews, and handling of employee disputes. Neither AFV Partners, nor its affiliated companies had any other HR employees on their payroll.

96.     Shortly after starting his employment, Tom was informed by Giger that payment of his salary would be deferred and that he would need to sign a Promissory Note in order to receive any payment from AFV Partners. Giger assured Tom that the loan proceeds would be treated as an advance on his carried interest and the "Tony would take care of [him]." Giger led Tom to believe that all the other co-founders were entering into similar loan agreements.

97.     In order to receive funds to live off of, on December 5, 2019, Tom executed a Secured Promissory Note with FSCP Co-Investment I in the amount of $100,000 ("Promissory Note 4"). This Note was secured by a first priority security interest in Tom's equity interests in FSCP Co-Investment I. (*See attached* Ex. 6).

98.      Between November 25, 2019 and June 2020, Tom devoted his full-time working efforts to AFV Partners and despite repeated promises of payment of compensation by Aquila, AFV Partners never paid any salary or bonuses to Tom and Aquila failed to execute the Carried Interest Documents allocating any portion of the Carried Interest to Tom.

99.     On May 29, 2020, Tom sent a demand letter, through his attorney, to Aquila and AFV Partners for payment of cash compensation and his carried interest.

100.     In response, on June 2, 2020, Aquila terminated Tom's employment without cause.

101.     On or about June 19, 2020, Tom received a payment of the net amount of $55,786. The payment came from an unknown entity identified as Anthony Aquila Sole MBR. The payment constitutes only a portion of what Tom is indisputably owed.

## Count I
### Breach of Employment Contract - Ryan Aprill
### (Against Defendants AF Ventures and AFV Partners)

102.    Plaintiff Ryan Aprill repeats, realleges and incorporates by reference the allegations in paragraphs 1 through 84 as though fully set forth herein.

103.    On or about August 4, 2019, Aquila offered Ryan full time employment as a Principal with AF Ventures and its affiliates, with a starting annual salary of $250,000 with an increase to $350,000 come when they closed their first investment or bought their first company, plus bonus and a percentage in the firms' carried interest in its investments.

104.    At that time, Ryan informed Aquila that he was only willing to leave his employment at Chaifetz Group if he was granted a carried interest allocation consistent with what is customary for a co-founder in a new private equity fund.  Aquila agreed and instructed Ryan to finalize payroll and employment documents with Lori McCutcheon, the CFO of AF Ventures.

105.    On August 5, 2020, Ryan received a letter from Lori McCutcheon outlining the terms of the employment offer from AF Ventures. The terms of the offer contemplated that Ryan's employment agreement would be assigned by AF Ventures to AFV Founders Select Capital Partners LLC, now known as AFV Partners.  That same day Ryan sent to Lori McCutcheon his proposed revisions to the employment offer, which included his entitlement to a percentage of carried interest as part of his overall compensation package.

106.    In the evening of August 5, 2019, Lori McCutcheon accepted Ryan's revisions and the parties' contract was formed.

107.    In reliance thereon, Ryan resigned from his employment with Chaifetz Group.

108.    Notwithstanding, the agreed offer letter was never tendered to Ryan for signature.

109.    Ryan began his employment with AFV Partners on August 7, 2019.

110.     In October 2019, after closing two large investments on behalf of AFV Partners, Aquila represented to Ryan that his total compensation package, including carried interest, would be commensurate with that of a "Principal" for a fund size of $500M - $749M as set forth in the H&S Report.  Based on that report, Aquila set Ryan's annual salary at $236,000, annual bonus at $234,000 and allocation of carried interest valued at $4,612,000, subject to future appreciation based on investment performance.

111.     Between August 7, 2019 and June 2, 2020, Ryan worked full time for AFV Partners.

112.     During that period, AFV Partners and its affiliates successfully raised over a quarter of a billion dollars from investors and invested those funds in dynamic technology businesses known as Sportradar, APG and RocketRoute.  Ryan played a central and essential role in creating and marketing the new venture, creating valuable intellectual property, overseeing its businesses and investments, identifying and selecting the companies to invest in, executing its investments, negotiating with investments and in building key relationships and goodwill worth millions. Notwithstanding Ryan's efforts, AF Ventures and AFV Partners failed to pay Ryan any of his agreed upon salary or bonus.

113.     In addition, Aquila failed to finalize or execute the Carried Interest Documents allocating Ryan's share of the equity interests in the SPV's and AFV Partners failed to make the required contribution to FSCP Co-Investment I.

114.      Left with no income, Aquila compelled Ryan to enter into a series of loans from FSCP Co-Investment I, documented by three (3) of Secured Promissory Notes.  See attached Ex.'s 3, 4 and 5, collectively (the Notes").

115.     Aquila assured Ryan that the Notes were secured by Ryan's carried interest and would be treated as an advance against future distributions.

116.    Despite repeated promises of payment of compensation by Aquila, AF Ventures and AFV Partners never paid any salary or bonuses to Ryan and Aquila failed to execute the Carried Interest Documents allocating the carried interest to Ryan and the other co-founding members.

117.    The failure of AF Ventures and AFV Partners to pay Ryan his salary or bonus pursuant to his employment contract constitutes a breach of contract.

118.    Additionally, the failure of Aquila to finalize and execute the Carried Interest Documents and the failure of AFV Partners to contribute Ryan's share of the carried interest to FSCP Co-Investment I constitutes a breach of contract.

119.    The equity interest in FSCP Co-Investment I to which Ryan is entitled is currently estimated to be valued between $8.0 million and $22.0 million, subject to continued appreciation based on the performance of Sportradar and other investments contributed to FSCP Co-Investment I.

120.    Ryan has fully performed his obligations under his employment agreement and created substantial value for AF Ventures and AFV Partners.

121.    As a direct and proximate result of the above breaches by AF Ventures and AFV Partners, Ryan has suffered damages in excess of $5,000,000.

WHEREFORE, Ryan Aprill respectfully requests that this Court enter judgment in his favor and against defendants AF Ventures and AFV Partners, in an amount in excess of $5,000,000 to be determined at trial of this matter, plus interest, attorney's fees where applicable, and costs of bringing this action.

### Count II
### Violation of Wage Payment and Collection Act - 820 ILCS 115
### (Against Defendants Aquila, AF Ventures and AFV Partners)

122.    Plaintiff Ryan Aprill repeats, reallges and incorporates by reference the allegations in paragraphs 1 through 84 as though fully set forth herein.

123.     Section 3 of the Illinois Wage Payment and Collection Act, 820 ILCS 115/1 *et seq*. ("Wage Payment Act"), provides: "Every Employer shall be required, at least semi-monthly, to pay every employee all wages earned during the semi-monthly period.  Wages of executive, administrative and professional employees . . . may be paid once a month.  820 ILCS 115/3.

124.     Section 4 of the Wage Payment Act provides that such wages shall be paid not later than 13 days after the end of the pay period in which such wages were earned, or in the case of executive, administrative and professional employees such wages may be paid on or before 21 calendar days after the period during which they were earned.  820 ILCS 115/4.

125.     Additionally, section 5 of the Wage Payment Act requires all employers to pay final compensation to separated employees in full at the time of separation but no later than the next scheduled pay period.  *See* 820 ILCS 115/5.

126.     Pursuant to Ryan's employment agreement he was entitled to an initial starting salary of $250,000, plus annual bonus and an allocation of AFV Partner's carried interest in the SPV's, with an increase to $350,000 to come when they closed additional investor funds or bought their first company.

127.     Aquila subsequently represented to Ryan that his total compensation package, including carried interest, would be commensurate with that of a "Principal" for a fund size of $500M - $749M as set forth in the H&S Report.  Based on that report, Aquila set Ryan's annual salary at $236,000, annual bonus at $234,000 and allocation of carried interest valued at $4,612,000, subject to appreciation based on the performance of Sportradar and other investments contributed to FSCP Co-Investment I.

128.     Between August 7, 2019 and June 2, 2020, Ryan devoted his full-time efforts to AF Ventures, AFV Partners and their affiliates.

129.    During his employment, despite repeated promises of payment of compensation, neither AF Ventures nor AFV Partners paid any portion salary or bonuses to Ryan in direct violation of the Sections 3 and 4 of the Wage Payment Act.

130.    Left with no regular income, Ryan was compelled to enter into loan agreements with FSCP Co-Investment I, purportedly secured by Ryan's allocation of carried interest.

131.    Notwithstanding, Aquila failed to execute the Carried Interest Documents allocating any portion of the carried interest to Ryan. Neither AF Ventures nor AFV Partners paid Ryan for the value of the carried interest he was promised.

132.    On June 2, 2020, Aquila terminated Ryan's employment with AF Ventures and AFV Partners without cause and in retaliation for Ryan's demand to be paid in accordance with the Wage Payment Act.

133.    Upon his termination, neither AF Ventures nor AFV Partners paid Ryan any portion of his earned salary, his earned bonus and failed to pay him for the value of the carried interest he earned during his employment.

134.    The equity interest in FSCP Co-Investment I to which Ryan is entitled is currently estimated to be valued between $8.0 million and $22.0 million, subject to continued appreciation based on the performance of Sportradar and other investments contributed to FSCP Co-Investment I.

135.    Both AF Ventures and AFV Partners have knowingly and intentionally failed and refused to pay Ryan his final compensation in direct violation of section 5 of the Wage Payment Act.

136.    On or about June 19, 2020, after his termination, Ryan received a check from an entity identified as Anthony Aquila Sole MBR in the net amount of $190,490.92.

137.    This payment is insufficient to compensate Ryan for his earned salary, his earned bonus and for the value of the carried interest he earned during his employment.

138.    The actions of AF Ventures and AFV Partners are in violation of sections 3, 4 and 5 of the Wage Payment Act.

139.    At all relevant times Aquila was the responsible agent in control of AF Ventures and AFV Partners, and Aquila willfully and deliberately refused to pay Ryan all compensation due to him.

140.    As a direct and proximate result of the actions of Aquila, AF Ventures and AFV Partners, Ryan has suffered damages in excess of $5,000,000.   In addition, Ryan is entitled to penalties and recovery of his attorney's fees and costs of this action pursuant to 820 ILCS 115/14 and 705 ILCS 225/1.

WHEREFORE, Ryan Aprill respectfully requests that this Court enter judgment in his favor and against defendants Aquila, AF Ventures and AFV Partners, in an amount in excess of $5,000,000 plus interest, penalties and attorney's fees and costs of this action.

### Count III
### Breach of Fiduciary Duty
### (Against Defendant Aquila)

141.    Plaintiff Ryan Aprill repeats, reallges and incorporates by reference the allegations in paragraphs 1 through 84 as though fully set forth herein.

142.    Aquila is a very wealthy and experienced entrepreneur who holds himself out as having been involved in over 70 transactions worth more than $15.0 billion in transaction value.

143.    Aquila controlled all aspects of AF Ventures, AFV Partners, AFV Management, the SPVs and their affiliates.

144.    In July and August of 2019, Aquila recruited Ryan to work for AF Ventures, AFV Partners and his family of companies.  Aquila promised Ryan an initial staring salary of $250,000, plus bonus and carried interest, with an increase to $350,000 to come when they closed their first investment or bought their first company.

145.    To induce Ryan to work for his companies, Aquila represented to Ryan that he had committed to invest $100 million of his own funds into AFV Partners.

146.    In addition, Aquila and Giger provided Ryan with an analysis which targeted the value of Ryan's carried interest at $15.9-$18.0 million.

147.    In reliance on these representations, Ryan justifiably placed his trust and confidence in Aquila when he agreed to give up a promising and lucrative career to work for Aquila and his family of companies.

148.    Ryan sacrificed his career with Chaifetz Group to begin his employment with AF Ventures and AFV Partners, and as a result Aquila gained substantial influence and superiority over Ryan.

149.    As a result of this special circumstance, Aquila owed him fiduciary duties of loyalty, good faith, reasonable care and fairness.   Ryan's future income and financial well-being were dependent upon Aquila honoring his word and acting honestly and in good faith.

150.    Ryan devoted his full-time efforts to Aquila, AF Ventures, AFV Partners, AFV Management, the SPVs and their affiliates.  The firms successfully raised over a quarter of a billion dollars from investors and invested those funds in dynamic technology businesses.

151.    In October 2019, after closing deals with at least two investors, Aquila represented to Ryan that his total compensation package, including carried interest, would be commensurate with that of a "Principal" for a fund size of $500M - $749M as set forth in the H&S Report.  Based on that report and methodology, Aquila set Ryan's annual salary at $236,000, annual bonus at $234,000 and allocation of carried interest valued at $4,612,000, subject to future appreciation based on investment performance.

152.     In large part due to Ryan's efforts, Ryan assisted Aquila in earning a valuable equity stake in Sportradar.  Without Ryan's assistance none of this would have been achieved.

153.     Notwithstanding, Aquila never made the $100 million investment into AFV Partners.

154.     Additionally, despite Ryan's efforts and significant accomplishments, Aquila failed to pay Ryan the promised salary or bonus, failed to finalize and execute the Carried Interest Documents and failed to cause AFV Partners and AFV Management to make the required carried interest contributions to FSCP Co-Investment I.

155.     Left with no regular income, Aquila compelled Ryan to enter into three separate loan agreements with FSCP Co-Investment I, purportedly secured by Ryan's allocation of carried interest.

156.     When Ryan confronted Aquila over his failure to pay his compensation or award him his carried interest, Aquila responded by terminating his employment in the midst of the COVID-19 pandemic.

157.     The actions of Aquila were in bad faith and constitute a breach of his fiduciary duties.

158.     As a direct and proximate result of the actions of Aquila, Ryan has suffered damages in excess of $5,000,000.

WHEREFORE, Ryan Aprill respectfully requests that this Court enter judgment in his favor and against defendant Aquila, in an amount in excess of $5,000,000 to be determined at trial of this matter, plus interest, attorney's fees where applicable, and costs of bringing this action.

**Count IV**
**Breach of Covenant of Good Faith and Fair Dealing**
**(Against Defendants AF Ventures and AFV Partners)**
**(Alternative Count)**

159.     Plaintiff Ryan Aprill repeats realleges and incorporates by reference the allegations in paragraphs 1 through 84 as though fully set forth herein.

160.    On or about August 4, 2019, Aquila offered Ryan full time employment as a Principal with Aquila Family Ventures, LLC and its affiliates, with a starting annual salary of $250,000 plus bonus, with an increase to $350,000 to come when they closed their first investment or bought their first company, and a percentage in the firms' carried interest in its investments.

161.    The terms of Ryan's employment offer were agreed to in an exchange of draft letters dated August 5, 2019, between Ryan and Lori McCutcheon, the CFO of Aquila Family Ventures, LLC.

162.    It was expressly agreed to by both parties that the terms of the employment agreement would be assigned by AF Ventures to AFV Partners, and would be binding with respect to Ryan's employment with AFV Partners.

163.    Ryan accepted the offer of employment, and in reliance thereon resigned from his employment with Chaifetz Group.

164.    Ryan began his employment with AFV Partners on August 7, 2019.

165.    Between August 7, 2019 and June 2, 2020, Ryan worked full time for AFV Partners.

166.    In October 2019, after closing deals with at least two investors, Aquila represented to Ryan that his total compensation package, including carried interest, would be commensurate with that of a "Principal" for a fund size of $500M - $749M as set forth in the H&S Report.  Based on that report and methodology, Aquila set Ryan's annual salary at $236,000, annual bonus at $234,000 and allocation of carried interest valued at $4,612,000, subject to future appreciation based on investment performance.

167.    Notwithstanding Ryan's efforts, AF Ventures and AFV Partners both failed to pay Ryan any portion of his agreed upon salary or bonus during the course of his employment.

168.    In addition, Aquila failed to finalize and execute the Carried Interest Documents allocating Ryan's share of the equity interests in the SPV's, and AFV Partners and AFV Management failed to make the required contributions to FSCP Co-Investment I.

169.    Left with no income, Aquila forced Ryan to enter into a series of loans from FSCP Co-Investment I, documented by three (3) of Secured Promissory Notes. See attached Ex.'s 3, 4 and 5.

170.    Aquila assured Ryan that the Notes were secured by Ryan's carried interest and would be treated as an advance against future distributions.

171.    Despite repeated promises of payment of compensation by Aquila, neither AF Ventures nor AFV Partners never paid any salary or bonuses to Ryan and Aquila failed to execute the Carried Interest Documents allocating the carried interest to Ryan or the other founding members.

172.    To the extent Aquila retained any discretion over the timing and payment of Ryan's compensation, he abused that discretion.

173.    The failure of AF Ventures and AFV Partners to pay Ryan his salary or bonus pursuant to his employment contract, and the failure of Aquila to finalize and execute the Carried Interest Documents or contribute Ryan's share of the carried interest to FSCP Co-Investment I constitutes a breach of the covenant of good faith and fair dealing.

174.    The equity interest in FSCP Co-Investment I to which Ryan is entitled is currently estimated to be valued between $8.0 million and $22.0 million, subject to continued appreciation based on the performance of Sportradar and other investments contributed to FSCP Co-Investment I.

175.    Ryan has fully performed his obligations under his employment agreement and created substantial value for AF Ventures and AFV Partners.

176.    As a direct and proximate result of the above breaches by AF Ventures and AFV Partners, Ryan has suffered damages in excess of $5,000,000.

WHEREFORE, Ryan Aprill respectfully requests that this Court enter judgment in his favor and against defendants AF Ventures and AFV Partners, in an amount in excess of $5,000,000 to be determined at trial of this matter, plus interest, attorney's fees where applicable, and costs of bringing this action.

### Count V
### Promissory Estoppel
### (Against Defendants Aquila, AF Ventures, AFV Partners and AFV Management)
### (Alternative Count)

177.    Plaintiff Ryan Aprill repeats, realleges and incorporates by reference the allegations in paragraphs 1 through 84 as though fully set forth herein.

178.    On or about August 4, 2019, Aquila, acting on behalf of AF Ventures and AFV Partners made an unambiguous promise to Ryan to hire him as a Principal, with a starting annual salary of $250,000, with an increase to $350,000 to come when they closed their first investment or bought their first company, plus bonus and a percentage in the firm's carried interest in its investments.

179.    Ryan reasonably relied on Aquila's promise and in response resigned from his employment at Chaifetz Group to go to work for AF Ventures and AFV Partners.

180.    Ryan's reliance was expected and foreseeable by Aquila, AF Ventures and AFV Partners.

181.    Thereafter, Ryan devoted his full-time efforts to the Aquila, AF Ventures, AFV Partners and their affiliates.  The firms successfully raised over a quarter of a billion dollars from investors and invested those funds in dynamic technology businesses. Aprill played a central and key role in creating and marketing the new venture, developing valuable intellectual property, overseeing its businesses and investments, identifying and selecting the companies to invest in, executing its investments, negotiating with investments and in building key relationships and goodwill worth millions.

182.    In October 2019, after closing deals with at least two investors, Aquila represented to Ryan that his total compensation package, including carried interest, would be commensurate with that of a "Principal" for a fund size of $500M - $749M as set forth in the H&S Report.  Based on that report and methodology, Aquila set Ryan's annual salary at $236,000, annual bonus at $234,000 and allocation of carried interest valued at $4,612,000, subject to future appreciation based on investment performance.

183.    In large part due to Ryan's efforts, the value of AFV Partners' investments has increased dramatically.  As a result, AFV Partners' carried interest is currently worth upwards of $250.0 million and is rapidly growing in value. Additionally, by consummating the Sportradar investments, Ryan assisted Aquila in earning a valuable equity stake in Sportradar. Without Ryan's assistance none of this would have been achieved.

184.    Despite these efforts and significant accomplishments, Aquila, AF Ventures and AFV Partners have refused to pay Ryan the promised salary or any salary or bonus at all, have refused to finalize and execute the Carried Interest Documents and have failed to adequately compensate him for his efforts.

185.    Despite repeated demands, Aquila, AF Ventures and AFV Partners failed to pay Ryan his promised salary, bonus and carried interest.

186.    On January 3, 2020, AFV Partners closed the acquisition of APG through SPV-3.  AFV Partners' carried interest in APG is currently held by AFV Management.

187.     In connection with Promissory Note 2, Aquila promised and represented that AFV Management would contribute the carried interest in APG to FSCP Co-Investment I, increasing the value of Ryan's and the other co-founders' Class B Units.

188. Ryan relied on this representation in agreeing to execute Promissory Note 2, and his reliance was reasonable and foreseeable.

189. AFV Management failed to contribute its carried interest in APG to FSCP Co-Investment I as promised.

190. The equity interest in FSCP Co-Investment I to which Ryan is entitled is currently estimated to be valued between $8.0 million and $22.0 million, subject to continued appreciation based on the performance of Sportradar and other investments contributed to FSCP Co-Investment I.

191. As a result of his reliance, Ryan has suffered damages in excess of $5,000,000.

WHEREFORE, Ryan Aprill respectfully requests that this Court enter judgment in his favor and against defendants Aquila, AF Ventures, AFV Partners and AF Management, in an amount in excess of $5,000,000 to be determined at trial of this matter, plus interest, attorney's fees where applicable, and costs of bringing this action.

<u>Count VI</u>
**Unjust Enrichment**
**(Against Defendants Aquila, AF Ventures, AFV Partners and AFV Management)**
**(Alternative Count)**

192. Plaintiff Ryan Aprill repeats, reallges and incorporates by reference the allegations in paragraphs 1 through 84 as though fully set forth herein.

193. Between August 7, 2019 and June 2, 2020, Ryan devoted his full-time efforts to the Aquila, AF Ventures, AFV Partners, AFV Management and their affiliates. The firms successfully raised over a quarter of a billion dollars from investors and invested those funds in dynamic technology businesses. Ryan played a central role in creating and marketing the new venture, developing valuable intellectual property, overseeing its businesses and investments, identifying and selecting the companies to invest in, executing its investments, negotiating with investments and in building key relationships and goodwill worth millions.

33

194.     In large part due to Ryan's efforts, the value of AFV Partners' investments has increased dramatically.  As a result, AFV Partners' carried interest is currently worth upwards of $250.0 million and is rapidly growing in value. Additionally, by consummating the Sportradar investments, Ryan assisted Aquila in earning a valuable equity stake in Sportradar. Without Ryan's assistance none of this would have been achieved.

195.     Ryan had a reasonable expectation of being compensated for his services.

196.     Defendants Aquila, AF Ventures and AFV Partners received and retained the benefit of Ryan's services without adequately paying for such services.

197.     As a result, defendants have been unjustly enriched and have defeated the reasonable expectations of Ryan.

198.     Ryan is entitled to be compensated for the reasonable value of his services.

199.     The reasonable value of Ryan's services exceeds $ $5,000,000.

WHEREFORE, Ryan Aprill respectfully requests that this Court enter judgment in his favor and against defendants Aquila, AF Ventures and AFV Partners, in an amount in excess of $5,000,000 to be determined at trial of this matter, plus interest, attorney's fees where applicable, and costs of bringing this action.

## Count VII
### Equitable Estoppel
### (Against Defendants Aquila and FSCP Co-Investment I)
### (Alternative Count)

200.     Plaintiff Ryan Aprill repeats, reallges and incorporates by reference the allegations in paragraphs 1 through 84 as though fully set forth herein.

201.     Defendant Aquila, individually and on behalf of AF Ventures and AFV Partners knowingly and intentionally made the following false representations designed to induce Ryan to leave a lucrative job at Chaifetz Group and accept employment with AF Ventures and AFV Partners.  Aquila

represented to Ryan that he would be hired as a Principal, with a starting annual salary of $250,000 plus bonus, with an increase to $350,000 to come when they closed their first investment or bought their first company, and a percentage in the firms' carried interest in its investments.

202.    In October 2019, after closing deals with at least two investors, Aquila represented to Ryan that his total compensation package, including carried interest, would be commensurate with that of a "Principal" for a fund size of $500M - $749M as set forth in the H&S Report. Based on that report and methodology, Aquila set Ryan's annual salary at $236,000, annual bonus at $234,000 and allocation of carried interest valued at $4,612,000, subject to future appreciation based on investment performance.

203.    These representations were false, and Aquila knew they were false when he made them as neither Aquila, nor AF Ventures or AFV Partners ever intended to pay Ryan his salary and bonus, and Aquila never intended to grant Ryan any share of the carried interest.

204.    Ryan relied on these representations in deciding to resign from his employment at Chaifetz Group and accept employment with AF Ventures and AFV Partners.

205.    Ryan's reliance on these representations was reasonable and foreseeable.

206.     Despite repeated demands, Aquila, AF Ventures and AFV Partners failed to pay Ryan his agreed upon salary, bonus and carried interest.

207.    Left with no regular income, Ryan was compelled to enter into three separate loan agreements with FSCP Co-Investment I in the aggregate amount of $300,000. See Ex.'s 3, 4 and 5.

208.    Pursuant to the terms of the Notes, the loans were to be secured by Ryan's allocation of carried interest.

209.     Notwithstanding, Aquila failed to finalize or execute the Carried Interest Documents allocating any portion of the carried interest to Ryan.  Additionally, neither AF Ventures nor AFV Partners paid Ryan for the value of the carried interest he was promised.

210.     On January 3, 2020, AFV Partners closed the acquisition of APG through SPV-3.  AFV Partners' carried interest in APG is currently held by AFV Management.

211.     In connection with Promissory Note 2, Aquila promised and represented that AFV Management would contribute the carried interest in APG to FSCP Co-Investment I, increasing the value of Ryan's and the other co-founders' Class B Units.

212.     Ryan relied on this representation in agreeing to execute Promissory Note 2, and his reliance was reasonable and foreseeable.

213.     AFV Management failed to contribute its carried interest in APG to FSCP Co-Investment I as promised.

214.     On May 29, 2020, Ryan sent a demand letter, through his attorney, to Aquila and AFV Partners for payment of cash compensation and his carried interest.

215.     In response, on June 2, 2020, Aquila terminated Ryan's employment with AF Ventures and AFV Partners without cause.

216.     Aquila knowingly and intentionally induced Ryan to accept employment with AF Ventures and AFV Partners with false promises of salary, bonuses and carried interest.

217.     Aquila never intended to honor his promises, and compelled Ryan to enter into the Notes with FSCP Co-Investment I in order to receive payment for his services.

218.     As a result of Aquila's wrongful conduct, FSCP Co-Investment I should be estopped from attempting to enforce the Notes.

WHEREFORE, Ryan Aprill respectfully requests that this Court enter judgment in his favor and against defendants Aquila and FSCP Co-Investment I, declaring the terms of the Notes invalid, estopping FSCP Co-Investment I from attempting to enforce the terms of the Notes and awarding him his attorney's fees and costs of bringing this action.

<u>Count VIII</u>
**Fraudulent Inducement – Ryan Aprill**
**(Against Defendants Aquila, AF Ventures and AFV Partners)**
**(Alternative Count)**

219.    Plaintiff Ryan Aprill repeats, realleges and incorporates by reference the allegations in paragraphs 1 through 84 as though fully set forth herein.

220.    Defendant Aquila, individually and on behalf of AF Ventures and AFV Partners knowingly and intentionally made the following false representations designed to induce Ryan to leave a lucrative job at Chaifetz Group and accept employment with AF Ventures and AFV Partners:

a.    Aquila represented that he would be investing $100 million of his own funds to start up AFV Partners;

b.    Aquila represented to Ryan that his departure from Solera Group was voluntary;

c.    Aquila represented to Ryan that he would be hired as a Principal, with a starting annual salary of $250,000 plus bonus, with an increase to $350,000 to come when they closed their first investment or bought their first company, and a percentage in the firms' carried interest in its investments;

d.    Aquila and Giger provided Ryan with an analysis prepared by Renato Giger which valued Ryan's carried interest at an estimated $15.9-$18.0 million;

e.    Aquila represented to Ryan that his total compensation package, including carried interest, would be commensurate with that of a "Principal" for a fund size of $500M - $749M as set forth in the H&S Report. Based on that report, Aquila set

Ryan's annual salary at $236,000, annual bonus at $234,000 and allocation of carried interest valued at $4,612,000, subject to future appreciation based on investment performance.

221.     These representations were false, and Aquila knew they were false when he made them, as Ryan now knows that neither Aquila, nor AF Ventures or AFV Partners ever intended to pay Ryan his salary and bonus, and Aquila never intended to grant Ryan any share of the carried interest.

222.     This was all part of a scheme by Aquila to use Ryan's knowledge and expertise to raise investor funds for Aquila's own personal benefit, and he never intended to pay Ryan the compensation he was promised.

223.     Additionally, Aquila did not and never intended to invest $100 million of his own funds to start up AFV Partners.

224.     Ryan relied on these representations in deciding to resign from his employment at Chaifetz Group and accept employment with AF Ventures and AFV Partners.

225.     Ryan would not have resigned from his employment at the Chaifetz Group but for the representations of Aquila.

226.     Aquila further represented to Ryan that the Notes he entered into with FSCP Co-Investment I would be secured by his carried interest.

227.     On January 3, 2020, AFV Partners closed the acquisition of APG through SPV-3.  AFV Partners' carried interest in APG is currently held by AFV Management.

228.     In connection with Promissory Note 2, Aquila promised and represented that AFV Management would contribute the carried interest in APG to FSCP Co-Investment I, increasing the value of Ryan's and the other co-founders' Class B Units.

229.    Ryan relied on this representation in agreeing to execute Promissory Note 2, and his reliance was reasonable and foreseeable.

230.    AFV Management failed to contribute its carried interest in APG to FSCP Co-Investment I as promised.

231.    Ryan further relied upon these representation in agreeing to execute the Notes with FSCP Co-Investment I.

232.    Ryan's reliance on these representations was reasonable and foreseeable.

233.    Despite repeated demands, Aquila, AF Ventures and AFV Partners failed to pay Ryan his agreed upon salary, bonus and carried interest.

234.    The equity interest in FSCP Co-Investment I to which Ryan is entitled is currently estimated to be valued between $8.0 million and $22.0 million, subject to continued appreciation based on the performance of Sportradar and other investments contributed to FSCP Co-Investment I.

235.    As a direct and proximate result of the actions of Aquila, AF Ventures and AFV Partners Ryan has suffered damages in an amount in excess of $5,000,000.

WHEREFORE, Ryan Aprill respectfully requests that this Court enter judgment in his favor and against defendants Aquila, AF Ventures and AFV Partners, in an amount in excess of $5,000,000 to be determined at trial of this matter, plus punitive damages, interest, attorney's fees where applicable, and costs of bringing this action.

## <u>Count IX</u>
**Breach of Employment Contract –Tom Aprill**
**(Against Defendant AFV Partners)**

236.    Tom Aprill repeats, reallges and incorporates by reference the allegations in paragraphs 1 through 21 and paragraphs 85 through 101 as though fully set forth herein.

237.     On November 25, 2019, Aquila offered Tom a full-time position as the head of Human Resources for AFV Partners and its other companies with an annual salary of $164,000, an annual bonus of $155,000, and a carried interest allocation with a value of at least $1.5 million, subject to future appreciation based on investment performance.

238.     Tom accepted Aquila's offer, resigned from his employment at DHR International and began working for AFV Partners.

239.     Tom began his employment with AFV Partners on or about November 25, 2019 and worked on average over 80 hours per week attempting to fill the human resource and staffing needs of AFV Partners and its related companies.

240.     On December 5, 2020, shortly after starting his employment Tom was informed by Renato Giger, CFO of AFV Partners that payment of his salary would be deferred and that he would need to sign a Promissory Note in order to receive any payment from AFV Partners.

241.     In order to receive funds to live off of, December 5, 2019, Tom executed a Secured Promissory Note with FSCP Co-Investment I in the amount of $100,000 ("Promissory Note 4"). This Note was secured by a first priority security interest in Tom's equity interests in FSCP Co-Investment I. (*See attached* Ex. 6).

242.     Between November 25, 2019 and June 2020, Tom continued to work for AFV Partners and despite repeated promises of payment of compensation by Aquila, AFV Partners never paid any salary or bonuses to Tom and Aquila failed to execute the Carried Interest Documents allocating any portion of the Carried Interest to Tom.

243.     The failure of AFV Partners to pay Tom his salary or bonus pursuant to his employment contract constitutes a breach of contract.

244.    Additionally, the failure of Aquila to execute the Carried Interest Documents and the failure of AFV Partners to contribute Tom's 's share of the carried interest to FSCP Co-Investment I constitutes a breach of his employment contract.

245.    Tom has fully performed his obligations under his employment agreement.

246.    As a direct and proximate result of the above breaches by AFV Partners, Tom has suffered damages in excess of $1,750,000.

WHEREFORE, Tom Aprill respectfully requests that this Court enter judgment in his favor and against defendant AFV Partners, in an amount in excess of $1,750,000 to be determined at trial of this matter, plus interest, attorney's fees where applicable, and costs of bringing this action.

### Count X
### Violation of Wage Payment and Collection Act - 820 ILCS 115
### (Against Defendants Aquila and AFV Partners)

247.    Tom Aprill repeats, reallges and incorporates by reference the allegations in paragraphs1 through 21 and paragraphs 85 through 101, as though fully set forth herein.

248.    Section 3 of the Illinois Wage Payment and Collection Act, 820 ILCS 115/1 *et seq*. ("Wage Payment Act"), provides: "Every Employer shall be required, at least semi-monthly, to pay every employee all wages earned during the semi-monthly period.  Wages of executive, administrative and professional employees . . . may be paid once a month.  820 ILCS 115/3.

249.    Section 4 of the Wage Payment Act provides that such wages shall be paid not later than 13 days after the end of the pay period in which such wages were earned, or in the case of executive, administrative and professional employees such wages may be paid on or before 21 calendar days after the period during which they were earned.  820 ILCS 115/4.

250.     Additionally, section 5 of the Wage Payment Act requires all employers to pay final compensation to separated employees in full at the time of separation but no later than the next scheduled pay period.  *See* 820 ILCS 115/5.

251.     Pursuant to Tom's employment contract he was entitled to an initial starting salary of $164,000, an annual bonus of $155,000, and a carried interest allocation with a value of at least $1.5 million, subject to future appreciation based on investment performance.

252.     Between November 25, 2019 and June 2, 2020, Tom devoted his full-time efforts AFV Partners.

253.      During his employment, despite repeated promises of payment of compensation, AFV Partners never paid any portion salary or bonuses to Tom in direct violation of the Sections 3 and 4 of the Wage Payment Act.

254.     On December 5, 2020, shortly after starting his employment Tom was informed by Renato Giger, CFO of AFV Partners that payment of his salary would be deferred and that he would need to sign a Promissory Note in order to receive any payment from AFV Partners.

255.     In order to receive funds to live off of, December 5, 2019, Tom executed Promissory Note 4 with FSCP Co-Investment I in the amount of $100,000.  This Note was secured by a first priority security interest in Tom's equity interests in FSCP Co-Investment I. (*See attached* Ex. 6).

256.      Between November 25, 2019 and June 2020, Tom continued to work for AFV Partners and despite repeated promises of payment of compensation by Aquila, AFV Partners never paid any salary or bonuses to Tom and Aquila failed to execute the Carried Interest Documents allocating any portion of the Carried Interest to Tom.

257.     On June 2, 2020, Aquila terminated Tom's employment with AFV Partners without cause, and in retaliation for Tom's demand to be paid in accordance with the Wage Payment Act.

258.    Upon his termination, AFV Partners failed to Tom any portion of his earned salary, his earned bonus and failed to pay him for the value of the carried interest he earned during his employment.

259.    AFV Partners have knowingly and intentionally failed and refused to pay Tom the full amount of his final compensation in direct violation of section 5 of the Wage Payment Act.

260.    On or about June 19, 2020, after his termination, Tom received a check from an entity identified as Anthony Aquila Sole MBR in the net amount of $55,786.

261.    This payment is insufficient to compensate Tom for his earned salary, his earned bonus and compensate him for the value of the carried interest he earned during his employment.

262.    The actions AFV Partners are in violation sections 3, 4 and 5 of the Wage Payment Act.

263.    At all relevant times Aquila was the responsible agent for AFV Partners and Aquila willfully and deliberately refused to pay Tom all compensation due to him.

264.    As a direct and proximate result of the actions of AFV Partners, Tom has suffered damages in excess of $1,750,000.  In addition, Tom is entitled to penalties and recovery of his attorney's fees and costs of this action pursuant to 820 ILCS 115/14.

WHEREFORE, Tom Aprill respectfully requests that this Court enter judgment in his favor and against defendants Aquila and AFV Partners, in an amount in excess of $1,750,000 plus interest, penalties and attorney's fees and costs of this action.

### Count XI
**Promissory Estoppel**
**(Against Defendants Aquila and AFV Partners)**
**(Alternative Count)**

265.    Tom Aprill repeats, reallges and incorporates by reference the allegations in paragraphs 1 through 21 and paragraphs 85 through 101, as though fully set forth herein.

266.     On or about November 25, 2019, Aquila, individually and on behalf of AFV Partners made an unambiguous promise to Tom Aprill to hire him as the head of Human Resources for AFV Partners and its other companies with an annual salary of $164,000, an annual bonus of $155,000, and a carried interest allocation with a value of at least $1.5 million, subject to future appreciation based on investment performance

267.     Tom reasonably relied on Aquila's promise and in response resigned from his employment as a partner at DHR International to go to work for AFV Partners.

268.     Tom's reliance was expected and foreseeable by Aquila and AFV Partners.

269.     Tom began his employment with AFV Partners on or about November 25, 2019 and worked on average over 80 hours per week attempting to fill the staffing needs of AFV Partners and its related companies.

270.     Notwithstanding all the work performed by Tom, Aquila and AFV Partners have refused to pay Tom his promised salary or any salary or bonus at all, have refused to document the carried-interest agreement, and have failed to compensate him in any way for his efforts.

271.     In addition, the unwarranted delay in documenting the carried interest has caused Tom significant economic harm as its value continues to rise over time and the appreciation that rightfully belongs to Tom is lost.

272.     Despite repeated demands, Aquila and AFV Partners failed to pay Tom his promised salary, bonus or carried interest.

273.     As a result of his reliance, Tom has suffered damages in excess of $1,750,000.

WHEREFORE, Tom Aprill respectfully requests that this Court enter judgment in his favor and against defendants Aquila and AFV Partners, in an amount in excess of $1,750,000 to be determined at trial of this matter, plus interest, attorney's fees where applicable, and costs of bringing this action.

**Count XII**
**Unjust Enrichment**
**(Against Defendants Aquila and AFV Partners)**
**(Alternative Count)**

274.    Tom Aprill repeats, reallges and incorporates by reference the allegations in paragraphs 1 through 21 and paragraphs 85 through 101, as though fully set forth herein.

275.    At the request of Aquila, Tom began performing services for Aquila and AFV Partners on or about November 25, 2019 and worked on average over 80 hours per week attempting to fill the human resource and staffing needs of AFV Partners and its related companies.

276.    Tom provided substantial services including but not limited to conducting market intelligence for benefits programs, processing employee bonus payouts for 2019, salary reviews and recommendations, recruitment activity, monthly employee reviews, and handling of employee disputes.

277.    Neither AFV Partners, nor its affiliated companies had any other HR employees on their payroll.

278.    Tom had a reasonable expectation of being compensated for his services.

279.    Defendants Aquila and AFV Partners received and retained the benefit of Tom's services without paying for such services.

280.    As a result, defendants have been unjustly enriched and have defeated the reasonable expectations of Tom.

281.    Tom is entitled to be compensated for the reasonable value of his services.

282.    The reasonable value of Tom's services exceeds $1,750,000.

WHEREFORE, Tom Aprill respectfully requests that this Court enter judgment in his favor and against defendants Aquila and AFV Partners, in an amount in excess of $1,750,000 to be determined

at trial of this matter, plus interest, attorney's fees where applicable, and costs of bringing this action.

**Count XIII**
**Fraudulent Inducement –Tom Aprill**
**(Against Defendants Aquila and AFV Partners)**
**(Alternative Count)**

283.    Tom Aprill repeats, reallges and incorporates by reference the allegations in paragraphs 1 through 21 and paragraphs 85 through 101, though fully set forth herein.

284.    Defendant Aquila, individually and on behalf of AFV Partners knowingly and intentionally made the following false representations designed to induce Tom to resign from his employment at DHR International and began working for AFV Partners: Aquila represented that Tom would: (1) be paid an initial salary of $164,000; (2) Tom would be paid an annual bonus of $155,000; and (3) Tom would receive a carried interest allocation with a value of at least $1.5 million, subject to future appreciation based on investment performance.

285.    These representations were false, and Aquila knew they were false when he made them as neither Aquila nor AFV Partners ever intended to pay Tom his salary and bonus, and Aquila never intended to grant Tom any share of the carried interest.

286.    This was all part of a scheme by Aquila to use Tom's human resource services for Aquila's own personal benefit, and the benefit of his companies, and he never intended to pay Tom the compensation he was promised.

287.    Tom relied on these representations in deciding to resign from his employment at DHR International and accept employment with AFV Partners.

288.    Tom would not have resigned from his employment as a partner at DHR International but for the representations of Aquila.

289.    Tom's reliance on these representations was reasonable and foreseeable.

290.    Despite repeated demands, Aquila and AFV Partners failed to pay Tom his agreed upon, salary, bonus or the value of his carried interest.

291.    As a direct and proximate result of the actions of Aquila and AFV Partners, Tom has suffered damages in an amount in excess of $1,750,000.

WHEREFORE, Tom Aprill respectfully requests that this Court enter judgment in his favor and against defendant AFV Partners, in an amount in excess of $1,750,000 to be determined at trial of this matter, plus punitive damages, interest, attorney's fees where applicable, and costs of bringing this action.

**Count XIV**
**Equitable Estoppel**
**(Against Defendants Aquila and FSCP Co-Investment I)**
**(Alternative Count)**

292.    Tom Aprill repeats, reallges and incorporates by reference the allegations in paragraphs 1 through 21 and paragraphs 85 through 101, as though fully set forth herein.

293.    Defendant Aquila, individually and on behalf of AFV Partners knowingly and intentionally made the following false representations designed to induce Tom to resign from his employment at DHR International and began working for AFV Partners: Aquila represented that Tom would: (1) be paid an initial salary of $164,000; (2) Tom would be paid an annual bonus of $155,000; and (3) Tom would receive a carried interest allocation with a value of at least $1.5 million, subject to future appreciation based on investment performance

294.    These representations were false, and Aquila knew they were false when he made them as neither Aquila nor AFV Partners ever intended to pay Tom his salary and bonus, and Aquila never intended to grant Tom any share of the carried interest.

295.    Tom relied on these representations in deciding to resign from his employment at DHR International and accept employment with AFV Partners.

296.     Between November 25, 2019 and June 2, 2020, Tom devoted his full-time efforts AFV Partners.

297.     On December 5, 2020, shortly after starting his employment Tom was informed by Renato Giger, CFO of AFV Partners that payment of his salary would be deferred and that he would need to sign a Promissory Note in order to receive any payment from AFV Partners.  Renato Giger assured Tom that the loan proceeds would be treated as an advance on his carried interest and the "Tony would take care of [him]."

298.     In order to receive funds to live off of, December 5, 2019, Tom executed Promissory Note $ with FSCP Co-Investment I in the amount of $100,000.  This Note was secured by a first priority security interest in Tom's equity interests in FSCP Co-Investment I. (*See attached* Ex. 6).

299.      Between November 25, 2019 and June 2020, Tom continued to work for AFV Partners and despite repeated promises of payment of compensation by Aquila, AFV Partners never paid any salary or bonuses to Tom and Aquila failed to execute the Carried Interest Documents allocating any portion of the Carried Interest to Tom.

300.     Tom relied on the Representation of Aquila and Giger in agreeing to execute the Promissory Note 4, and his reliance was reasonable and foreseeable.

301.     On May 29, 2020, Tom sent a demand letter, through his attorney, to Aquila and AFV Partners for payment of cash compensation and his carried interest.

302.      In response, on June 2, 2020, Aquila terminated Tom's employment with AF Ventures and AFV Partners without cause.

303.     Aquila knowingly and intentionally induced Tom to accept employment with AF Ventures and AFV Partners with false promises of salary, bonuses and carried interest.

304. Aquila never intended to honor his promises, and compelled Tom to enter into the Notes with FSCP Co-Investment I in order to receive payment for his services.

305. As a result of Aquila's wrongful conduct, FSCP Co-Investment I should be estopped from attempting to enforce Promissory Note 4 against Tom.

WHEREFORE, Tom Aprill respectfully requests that this Court enter judgment in his favor and against defendants Aquila and FSCP Co-Investment I, declaring the terms of Promissory Note 4 invalid, estopping FSCP Co-Investment I from attempting to enforce the terms of the Note and awarding him his attorney's fees and costs of bringing this action.

## JURY DEMAND

Plaintiffs demand trial by jury.

Dated: August 7, 2020                    Respectfully submitted,

**RYAN L. APRILL**
**THOMAS S. APRILL,**

By: /s/ *Michael K. Desmond*
        One of Their Attorneys

Peter A. Silverman (ARDC No. 6196081)
Michael K. Desmond (ARDC No. 6208809)
FIGLIULO & SILVERMAN, P.C.
10 South LaSalle Street
Suite 3600
Chicago, Illinois 60603
(312) 251-4600
psilverman@fslegal.com
mdesmond@fslegal.com