## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| RYAN L. APRILL, an individual, and THOMAS S. APRILL, an individual, <br><br> Plaintiffs, <br><br> v. <br><br> ANTHONY AQUILA, AQUILA FAMILY VENTURES, LLC, AFV FOUNDERS SELECT CAPITAL PARTNERS LLC, a/k/a AFV PARTNERS LLC, AFV MANAGEMENT ADVISORS LLC, AFV FSCP CO-INVESTMENT I LLC, a/k/a AFV PARTNERS CO-INVESTMENT I LLC, <br><br> Defendants. | Case No. 20 C 04657 <br><br> Judge Martha M. Pacold |

### MEMORANDUM OPINION AND ORDER

Plaintiff Ryan Aprill is a former employee of defendants Aquila Family Ventures, LLC ("AF Ventures") and AFV Founders Select Capital Partners LLC ("AFV Partners"). Plaintiff Tom Aprill, Ryan's father, is a former employee of AF Ventures. Both companies (and all of the corporate defendants) are managed by defendant Anthony Aquila. Both Ryan and Tom allege that they had employment contracts that promised them hundreds of thousands of dollars in salary and bonuses, in addition to interests in AFV Partners' significant investments. According to their complaint, they were not paid their due compensation and instead induced to sign promissory notes with defendant AFV FSCP Co-Investment I LLC ("FSCP Co-Investment I") in return for their salaries. But, despite signing the promissory notes, Plaintiffs allege they were ultimately terminated without receiving any compensation.

Defendants moved to dismiss the complaint under Rules 9(b), 12(b)(3), and 12(b)(6), and to strike certain allegations in the complaint as scandalous or irrelevant under Rule 12(f). For the reasons that follow, Defendants' motion is stayed in part, granted in part, and denied in part.

## BACKGROUND

The following facts are taken from the complaint and additional materials submitted by Defendants in support of their request to dismiss under Rule 12(b)(3).

### A.    Ryan's Involvement with AFV Partners

Before working for AFV Partners and its affiliates, Ryan was the Vice President of Chaifetz Group, a private investment firm, "where he served as a senior private equity and investment professional." [1] ¶ 22.[1] Beginning around April 2019, "Ryan was actively recruited by Aquila . . . to join [Aquila] in co-founding a new private equity firm identified as AFV Partners." *Id.* ¶ 23. Aquila had previously "served as founder and Chief Executive Officer of Solera and its affiliates." *Id.* ¶ 28. Aquila ultimately became "the President and Managing Member of AFV Partners and" AFV Management Advisors LLC and "the president, controlling member and/or manager of each of the other Defendant entities and their affiliates." *Id.* ¶ 27.

AFV Partners' plan "was to raise money from institutional-sized family offices, pension and global sovereign wealth funds to invest in dynamic technology businesses with the goal of growing those businesses, selling them and/or taking them public and reaping the financial benefits and profits of doing so." *Id.* ¶ 24. Such "investments were to be made directly through an innovative holding company structure and indirectly through a variety of other investment vehicles and structures, with some of the world's largest and most sophisticated investors, employing special purpose vehicles." *Id.* ¶ 25.

"Aquila solicited and actively recruited Ryan to join AFV Partners to assist him in locating new investors for the purposes of investing in Sportradar," a "provider of sports data and intelligence," and "pursuing other prospective investments." *Id.* ¶¶ 29–30. Around June 2019, "Aquila represented to Ryan that he secured a $30 million investment . . . to help fund the launch of AFV Partners," and "Ryan began collaborating on potential investment structures and strategies with Aquila and his executive team." *Id.* ¶ 32. In July 2019, "Aquila and Ryan discussed the idea of Ryan joining the new venture on a full-time basis as a co-founding member . . . and invit[ed] Ryan to attend an upcoming Sportradar meeting in Las Vegas." *Id.* ¶ 33. Ryan attended the Las Vegas meeting and "had ongoing discussions and negotiations [with Aquila] regarding having Ryan joining the new venture as a co-founding member." *Id.* ¶ 34.

On August 2, 2019, Ryan received a spreadsheet detailing his and the other co-founders' proposed compensation. *Id.* ¶ 35. "Ryan's proposed annual base salary

---

[1] Bracketed numbers refer to docket entries and are followed by page and / or paragraph number citations. Page numbers refer to the CM/ECF page number.

was $250,000, with an increase to $350,000 when AFV Partners[] closed their first investment." *Id.* Ryan's compensation also included "carried interest"—AFV Partners' "own equity stake in the companies and investment vehicles in which it [would] invest[.]" *Id.* ¶¶ 26, 35. "Ryan's share of the proposed carried interest was targeted at $15.9–$18.0 million." *Id.* ¶ 35.

Around August 4, 2019, Ryan and Aquila "finalized their discussions regarding Ryan joining AFV Partners as a co-founding member" and Aquila "offer[ed] Ryan full-time employment as a Principal with AF Ventures and its affiliates, with a starting annual salary of $250,000 and an increase to $350,000 when they closed their first investment or bought their first company, plus bonus and a percentage in the firms' carried interest in its investments." *Id.* ¶ 36. Ryan "reiterated that he was only willing to leave his current employment at Chaifetz Group if he was granted a carried interest allocation consistent with what is customary for a co-founder in a new private equity fund." *Id.* "The parties agreed and Aquila instructed Ryan to finalize payroll and employment documents with Lori McCutcheon, the CFO of AF Ventures." *Id.*

The next day, August 5, 2019, "Ryan received a letter from Lori McCutcheon outlining the terms of the employment offer from AF Ventures. The terms of the offer contemplated that Ryan's employment agreement would be assigned by AF Ventures to AFV Founders Select Capital Partners LLC, now known as AFV Partners." *Id.* ¶¶ 37–38. "That same day Ryan sent to Lori McCutcheon his proposed revisions to the employment offer, which included his entitlement to a percentage of carried interest as part of his overall compensation package." *Id.* "Lori McCutcheon accepted Ryan's revisions and the parties' contract was formed." [1] ¶ 38. Along with the employment offer, Ryan also sent back an unsigned document titled "Mutual Arbitration Agreement," which stated that, subject to certain exceptions, "Employee and Aquila Family Ventures LLC . . . agree all disputes and claims between them shall be determined exclusively by final and binding arbitration before a single, neutral arbitrator." [25-3] ¶ 1.

"On August 6, 2019, in reliance on the employment agreement and the representations of Aquila . . . [and others] Ryan resigned from his employment with Chaifetz Group, sacrificing a substantial compensation package and economic prospects in order to join Aquila and AFV Partners." *Id.* ¶ 40. On August 7, 2019, Ryan began working at AFV Partners out of his home office in Chicago. *Id.* ¶ 41.

Shortly after starting at AFV Partners, Aquila "attempted to retract the terms of Ryan's employment agreement, and demanded that Ryan have '*skin in the game*' in order to receive his promised carried interest." *Id.* ¶ 43. Aquila demanded that "any money paid to Ryan and the other co-founders be treated as loans and not salary, at least until the parties completed their first acquisition," with the loans "secured by the carried interest allocated to each of the co-founding members." *Id.*

¶ 44. "[N]o agreement was reached" and "Aquila promised to formalize the terms of any loans and the carried interest vehicle." *Id.*

Aquila later "insisted that the carried interest vehicle be the same entity making the loans to the co-founding members, so that the loans would be secured by their equity interests." *Id.* ¶ 47. "That entity is identified as FSCP Co-Investment I." *Id.* "Formation documents for the carried interest vehicle" were ultimately prepared (the "Carried Interest Documents") but not executed. *Id.* ¶¶ 48, 59.

Nevertheless, "[o]n September 20, 2019, in reliance upon the terms of the Carried Interest Documents and the representations of Aquila regarding Ryan's entitlement to a share of the carried interest . . . Ryan executed the first of three (3) Secured Promissory Notes with FSCP Co-Investment I in the amount of $100,000," which was "secured by a first priority security interest in Ryan's equity interest in FSCP Co-Investment I." *Id.* ¶ 53. Ryan later executed the two additional promissory notes, both in the amount of $100,000 and secured by Ryan's equity interests in FSCP Co-Investment I. *Id.* ¶¶ 61, 70.

Around October 31, 2019, "Aquila agreed to use the 2018 Heidrick & Struggles . . . compensation report and methodology as the basis for establishing Ryan's total compensation including salary, bonus and carried interest and Ryan also agreed." *Id.* ¶ 56. "Based on that report, Aquila agreed that Ryan's annual salary would be set at $236,000, annual bonus at $234,000 and his carried interest allocation would be valued at $4,612,000, subject to future appreciation based on investment performance." *Id.*

"Despite repeated promises of payment of compensation by Aquila, neither AF Ventures nor AFV Partners paid any salary or bonuses to Ryan, and Aquila failed to finalize and execute the Carried Interest Documents allocating the Carried Interest to Ryan and the other co-founding members." *Id.* ¶ 59.

In April 2020, "Ryan confronted Aquila" about the failure to pay compensation and execute the Carried Interest Documents. *Id.* ¶ 68. Aquila "attempted to convince Ryan to accept a lower salary than previously agreed" and Ryan rejected the proposal. *Id.* ¶ 69. Around May 23, 2020, "Ryan's personal attorney contacted Aquila over the company's failure to pay Ryan his agreed upon compensation and his failure to execute the Carried Interest Documents. While Aquila assured Ryan's attorney his compensation would be paid, and the carried interest would be documented by August 2020, Aquila reacted negatively to the phone call." *Id.* ¶ 74. Ryan was ultimately terminated by Aquila without cause on June 2, 2020. *Id.* ¶ 78. Around June 19, 2020, "Ryan received a payment of the net amount of $190,490.92." *Id.* ¶ 81.

During Ryan's tenure at the company, AFV Partners was a successful business. Among other accomplishments, "AFV Partners closed a $50 million

investment" that was "used to invest in Sportradar." *Id.* ¶ 42. "AFV Partners raised an additional €73 million euro from another investor and used the proceeds to invest in Sportradar." *Id.* ¶ 47. AFV Partners also acquired "Aircraft Performance Group." *Id.* ¶¶ 54, 62. In May 2020, "Ryan and Aquila" determined that the fair market value of AFV Partners' carried interest was "as high as approximately $250.0 million." *Id.* ¶ 71.

## B. Tom's Involvement with AFV Partners

Tom, Ryan's father, "was first introduced to Aquila in August 2018." [1] ¶¶ 85, 87. Tom was a Partner at Heads International, "a global executive search firm." *Id.* ¶ 86. "Tom began working for Aquila as a consultant in October 2018, when Heads International was retained by Solera Group to perform an executive search." *Id.* ¶ 87.

Aquila began reaching out to Tom in April 2019 about AFV Partners and, in June 2019, inquired whether "Tom was interested in a temporary or permanent employment position at AFV Partners." *Id.* ¶ 89. Although they could not reach an agreement, Aquila continued to approach Tom about working at AFV Partners through the end of the year, including after Tom started working at DHR International. *Id.* ¶¶ 89–91.

On November 25, 2019, in Dallas, Texas, Aquila "offered Tom a full-time position as the head of Human Resources for AFV Partners and its other companies." *Id.* ¶ 93. "Aquila offered Tom an annual salary of $164,000, an annual bonus of $155,000, and a carried interest allocation with a value of approximately $1.5 million (subject to future appreciation based on investment performance) based on the [Heidrick & Struggles] report and methodology." *Id.* "In reliance on Aquila's offer of employment with AFV Partners, Tom resigned his position as a partner with DHR International and accepted Aquila's employment offer." *Id.* ¶ 94.

Tom began working at AFV Partners on "November 25, 2019, and worked on average over 80 hours per week attempting to fill the human resource and staffing needs of AFV Partners and its related companies." *Id.* ¶ 95.

"Shortly after starting his employment, Tom was informed . . . that payment of his salary would be deferred and that he would need to sign a Promissory Note in order to receive any payment from AFV Partners." *Id.* ¶ 96. Tom was told "that the loan proceeds would be treated as an advance on his carried interest and . . . '[Aquila] would take care of [him].'" *Id.* Tom ultimately executed a promissory note in the amount of $100,000 "secured by a first priority security interest in Tom's equity interests in FSCP Co-Investment I." *Id.* ¶ 97.

"[D]espite repeated promises of payment of compensation by Aquila, AFV Partners never paid any salary or bonuses to Tom and Aquila failed to execute the Carried Interest Documents allocating any portion of the Carried Interest to Tom."

5

*Id.* ¶ 98. "On May 29, 2020, Tom sent a demand letter, through his attorney, to Aquila and AFV Partners for payment of cash compensation and his carried interest." *Id.* ¶ 99. "In response, on June 2, 2020, Aquila terminated Tom's employment without cause." *Id.* ¶ 100. "On or about June 19, 2020, Tom received a payment of the net amount of $55,786," which the complaint alleges "constitutes only a portion of what Tom is indisputably owed." *Id.* ¶ 101.

### C. Procedural History

Plaintiffs filed suit against Defendants. [1]. The complaint includes fourteen counts (eight claims brought by Ryan, six claims brought by Tom), including breach of contract, violation of the Illinois Wage Payment and Collection Act, breach of fiduciary duty, breach of the covenant of good faith and fair dealing, promissory estoppel, unjust enrichment, equitable estoppel, and fraudulent inducement. The court has jurisdiction under 28 U.S.C. § 1332.

Defendants filed a motion to dismiss [24] under Rules 9(b), 12(b)(3), and 12(b)(6), arguing that Ryan's claims should be dismissed because they must be resolved through arbitration and that Tom's claims were either subject to arbitration or should be dismissed on the merits. Defendants also seek to strike certain allegations from the complaint as scandalous or irrelevant under Rule 12(f).

## LEGAL STANDARD

"[A] motion to dismiss based on a contractual arbitration clause is appropriately conceptualized as an objection to venue, and hence properly raised under Rule 12(b)(3)." *Faulkenberg v. CB Tax Franchise Sys., LP*, 637 F.3d 801, 807 (7th Cir. 2011) (internal quotation marks omitted). Similar to a Rule 12(b)(6) motion, when deciding a Rule 12(b)(3) motion, "reasonable inferences from the facts should be construed in the [non-moving party's] favor." *Jackson v. Payday Fin., LLC*, 764 F.3d 765, 773 (7th Cir. 2014). However, unlike a Rule 12(b)(6) motion, the court is "not obligated to limit its consideration to the pleadings nor to convert the motion to one for summary judgment." *Cont'l Cas. Co. v. Am. Nat'l Ins. Co.*, 417 F.3d 727, 733 (7th Cir. 2005). In this context, a Rule 12(b)(3) motion is functionally the same as a motion to compel arbitration, meaning the "central question" is "Did the parties agree to arbitrate their claims?" *Nandorf, Inc. v. Applied Underwriters Captive Risk Assurance Co.*, 410 F. Supp. 3d 882, 887 (N.D. Ill. 2019); *Ferenc v. Brenner*, 927 F. Supp. 2d 537, 542 (N.D. Ill. 2013).

When reviewing a motion to dismiss under Rule 12(b)(6), the court "accept[s] as true all factual allegations in the complaint and draw[s] all permissible inferences in plaintiff['s] favor." *Boucher v. Fin. Sys. of Green Bay, Inc.*, 880 F.3d 362, 365 (7th Cir. 2018). "To survive a motion to dismiss, a plaintiff must allege 'enough facts to state a claim relief that is plausible on its face.'" *Id.* at 365–66 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 366 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Federal pleading standards do "not require detailed factual allegations, but [they] demand[] more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted). "[N]aked assertion[s] devoid of further factual enhancement" are insufficient. *Id.* (second alteration in original, internal quotation marks omitted).

## DISCUSSION

## I. Arbitration

### A. Ryan's Claims Against AF Ventures

Defendants argue that Ryan's claims must be dismissed under Rule 12(b)(3) because he agreed to arbitrate them. Specifically, they argue that when Ryan accepted the offer letter he was sent (the "Offer of Employment" [25-2]), he accepted the Mutual Arbitration Agreement, [25-3], as well because the Agreement was incorporated by reference into the Offer. Alternatively, Defendants argue that Ryan accepted the Mutual Arbitration Agreement at the same time he accepted the Offer of Employment. In opposition, Plaintiffs argue that Ryan never agreed to arbitration because the Mutual Arbitration Agreement was neither incorporated in the Offer of Employment nor signed by the parties.[2] Plaintiffs do not dispute that, if the Mutual Arbitration Agreement is binding, all of Ryan's claims fall within the scope of the Agreement and must be resolved through arbitration.[3]

Under the Federal Arbitration Act ("FAA"),[4] "[w]hen deciding whether the parties agreed to arbitrate a certain matter, courts generally should apply ordinary state-law principles that govern the formation of contracts." *Druco Restaurants, Inc. v. Steak N Shake Enters., Inc.*, 765 F.3d 776, 781 (7th Cir. 2014). Although federal policy favors arbitration, this policy applies only "when determining the

---

[2] Plaintiffs also argue that, even if the Offer of Employment imposed upon Ryan an obligation to execute an arbitration agreement, that obligation has been waived. The court does not address this argument because Defendants do not contend that Ryan's obligation to execute such an agreement is a basis for dismissal. Defendants contend that Ryan has *already* executed (or otherwise agreed to) the Mutual Arbitration Agreement, not that he is obligated to do so now or in the future.

[3] [25-3] ¶ 1 (subject to certain exceptions, "Employee and Aquila Family Ventures LLC . . . agree all disputes and claims between them shall be determined exclusively by final and binding arbitration before a single, neutral arbitrator").

[4] The Mutual Arbitration Agreement stipulates that "actions to enforce this Agreement . . . [are] governed by the Federal Arbitration Act." [25-3] ¶ 1. No party disputes that the FAA applies.

*scope* of an agreement to arbitrate, . . . not when deciding whether there is an agreement to arbitrate in the first instance." *Id.*

The Mutual Arbitration Agreement is "governed by the Texas law [*sic*] without regard to choice of law," [25-3] ¶ [9], and all parties apply Texas law to the issue of whether Ryan agreed to arbitrate his claims, [31] at 11; [32] at 8–10. Under Texas law, "[t]he elements of a valid contract are (1) an offer, (2) an acceptance, (3) a meeting of the minds, (4) each party's consent to the terms, and (5) execution and delivery of the contract with the intent that it be mutual and binding." *SK Plymouth, LLC v. Simmons*, 605 S.W.3d 706, 715 (Tex. App. 2020).

Based on the present record, the Mutual Arbitration Agreement was not incorporated by reference into the Offer of Employment. Ryan may have, however, independently accepted the Mutual Arbitration Agreement because the parties' signatures were not a condition precedent to acceptance of the Agreement. But, because of the incomplete factual record, the court cannot determine whether Ryan (or Defendants) accepted the Agreement. Additional evidence is therefore necessary to resolve whether Ryan's claims must be arbitrated.

First, the Offer of Employment does not incorporate the Mutual Arbitration Agreement. "Texas contract law allows a document or provisions from another document to be incorporated into a contract." *Norred v. Cotton Patch Café, LLC*, No. 3:19-CV-1010-G, 2019 WL 5425479, at *4 (N.D. Tex. Oct. 22, 2019). "Under the doctrine of incorporation by reference, an unsigned paper may be incorporated by reference in the paper signed by the person sought to be charged. The language used is not important provided [that] the document signed . . . plainly refers to another writing." *Id.* (internal quotation marks omitted) (alterations in original). "[A] mere reference to another document is not enough to establish a wholesale incorporation of the referenced document when the facts and circumstances surrounding the agreement do not indicate that incorporation was intended." *Id.* (internal quotation marks omitted) (alteration in original). "When, however, the reference to another document is clear and the circumstances indicate that the intent of the parties was incorporation, [Texas] courts have held that a document may be incorporated, even in the absence of specific language of incorporation." *Id.* (internal quotation marks omitted) (alteration in original).

Neither the terms of the Offer of Employment nor the circumstances surrounding Ryan's acceptance of it (as the record currently stands) indicate that the parties intended to incorporate the Mutual Arbitration Agreement.

Defendants assert that the Offer of Employment's terms establish that the parties intended to incorporate the Mutual Arbitration Agreement because the Offer states: "You and AFV shall execute the arbitration agreement set forth in Exhibit B." [25-2] ¶ 7. The Offer makes no other mention of any arbitration agreement or "Exhibit B."

This single mention of an arbitration agreement does not establish an intention to incorporate the Mutual Arbitration Agreement. To the contrary, by stating that the parties "shall execute" an arbitration agreement, the Offer indicates that the arbitration agreement would be completed separately and was not incorporated into the Offer itself. *See Mid-Continent Cas. Co. v. Glob. Enercom Mgmt., Inc.*, 323 S.W.3d 151, 157 (Tex. 2010) ("Black's Law Dictionary defines 'execute' as '[t]o perform or complete (a contract or duty) . . . [or] [t]o make (a legal document) valid by signing; to bring (a legal document) into its final, legally enforceable form." (quoting *Execute*, BLACK'S LAW DICTIONARY (8th ed. 2004))); *Execute*, BLACK'S LAW DICTIONARY (11th ed. 2019) (similar). If the Mutual Arbitration Agreement was incorporated into the Offer of Employment, then there would be no need for the parties to "execute" a separate arbitration agreement, and the Offer's command that the parties "shall" execute such an agreement would be rendered superfluous. *See Firstlight Fed. Credit Union v. Loya*, 478 S.W.3d 157, 169 (Tex. App. 2015) ("[T]he court must examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." (internal quotation marks omitted)); *Lesikar v. Moon*, 237 S.W.3d 361, 367 (Tex. App. 2007) ("The word 'shall' as used in contracts is generally mandatory, operating to impose a duty."). Defendants also do not point to any circumstances surrounding the execution of the Offer of Employment that would indicate the parties intended to incorporate the Mutual Arbitration Agreement. Thus, the Mutual Arbitration Agreement was not incorporated into the Offer.

Second, the present record is insufficient to determine whether the parties independently accepted and entered into the Mutual Arbitration Agreement. Defendants contend that "Ryan . . . assented to the Arbitration Agreement with the same actions and words he contends manifested his assent to the [Offer of Employment]." [32] at 9. The Mutual Arbitration Agreement has two signature blocks, one for Ryan and another for a representative of AF Ventures, but there are no signatures on the document. [25-3] at 3. Defendants therefore argue that Ryan assented by making edits to the Offer of Employment and sending the Offer to Lori McCutcheon (CFO of AF Ventures) along with the Mutual Arbitration Agreement and another document, stating: "I think these documents work well in the interim for employees coming into AFV and then moving to FSCP. . . . I have made a few changes to the offer letter (applicable to myself and I think good for other new hires) in track changes. Let me know what you think." [25-1]; [32] at 9. As for plaintiffs' allegations on this issue, the complaint does allege that "Lori McCutcheon accepted Ryan's revisions and the parties' contract was formed." [1] ¶ 38. But the complaint's reference to a contract is to the Offer of Employment mentioned in the previous and subsequent paragraphs of the complaint, *id.* ¶¶ 37, 39; the complaint does not mention an arbitration agreement.

Plaintiffs argue that the lack of a signature on the Mutual Arbitration Agreement conclusively establishes that the parties did not agree to arbitrate

Ryan's claims. But, applying Texas law, the parties could accept the Mutual Arbitration Agreement without signing it. "Under standard contract principles, the presence or absence of a party's signature on a written contract is relevant to determining whether there was an intent for an agreement to be binding." *Wright v. Hernandez*, 469 S.W.3d 744, 756 (Tex. App. 2015). "Typically, a party manifests its assent by signing an agreement. However, while signature and delivery are often evidence of the mutual assent required for a contract, they are not essential." *SK Plymouth*, 605 S.W.3d at 715 (internal quotation marks and citation omitted). "[T]he absence of a party's signature does not necessarily destroy an otherwise valid contract and is not dispositive of the question of whether the parties intended to be bound by the terms of a contract." *Wright*, 469 S.W.3d at 757. "If a written draft of an agreement is prepared, submitted to both parties, and each of them expresses his unconditional assent thereto, there is a written contract." *Mid-Continent Cas.*, 323 S.W.3d at 157 (quoting *Simmons & Simmons Constr. Co., Inc. v. Rea*, 286 S.W.2d 415, 418 (Tex. 1956)). In other words, "when there is no evidence in the record to suggest that the parties intended for a signature to be a condition precedent to the signing of an agreement, then a party's failure to sign the agreement does not render the agreement unenforceable, as long as it appears that the parties otherwise gave their consent to the terms of the agreement." *Wright*, 469 S.W.3d at 758. Whether the parties intended to make signing a document a condition precedent to the completion of the contract is a question of intent that "[a] court can decide . . . as a matter of law" if the record supports it. *Kamel v. Avenue Insights & Analytics LLC*, No. 6:18-cv-422-JDK-KNM, 2020 WL 4679574, at *4 (E.D. Tex. May 5, 2020), *report and recommendation adopted*, No. 6:18-cv-422-JDK-KNM, 2020 WL 5939052 (E.D. Tex. Oct. 7, 2020) (quoting *Huckaba v. Ref–Chem, L.P.*, 892 F.3d 686, 689 (5th Cir. 2018)).

To determine whether signatures were a condition precedent to acceptance of the Mutual Arbitration Agreement, "the terms of the purported contract itself" dictate "whether an offer was conditioned on certain criteria or not." *McGehee v. Endeavor Acquisitions, LLC*, 603 S.W.3d 515, 523 (Tex. App. 2020) (internal quotation marks omitted); *see also SK Plymouth*, 605 S.W.3d at 716 ("[W]hen the express language of the agreement require[s] the parties' signatures either to make the arbitration agreement binding or to modify the agreement, an employer must sign an arbitration agreement for it to be a valid, enforceable contract.").

Plaintiffs point to two facts they contend demonstrate that the parties intended signatures to be required for the Mutual Arbitration Agreement to become effective: (1) the Offer of Employment states that the parties "shall execute the arbitration agreement," [25-2] ¶ 7; and (2) the Agreement states that "[b]y signing this Agreement, Employee acknowledges that he or she is knowingly and voluntarily waiving the right to file a lawsuit," [25-3] ¶ 7. Neither establishes that signatures were a prerequisite to acceptance of the Mutual Arbitration Agreement.

The Offer of Employment's reference to "execut[ing] the arbitration agreement," [25-2] ¶ 7 ("You and AFV shall execute the arbitration agreement set forth in Exhibit B"), is not evidence that the Mutual Arbitration Agreement must be signed to be accepted. As mentioned above, "Texas law recognizes that a contract need not be signed to be 'executed' unless the parties explicitly require signatures as a condition of mutual assent." *Mid-Continent Cas.*, 323 S.W.3d at 157; *id.* ("[T]he word 'execute' has several definitions and is not constrained by Mid-Continent's argument that 'to execute' may only mean 'to sign.'"). The Offer of Employment's statement that the parties "shall execute" an arbitration agreement therefore does not establish that the parties intended to require that the Mutual Arbitration Agreement be signed. *See SK Plymouth*, 605 S.W.3d at 717 (signature was not a condition precedent to acceptance of arbitration agreement even though another agreement stated that the arbitration agreement would be "separately executed"); *McGehee*, 603 S.W.3d at 524 (holding that there was "no language in the [contract] requiring that Endeavor accept Appellants' counteroffer only by signing" despite contract's statement that it would be "executed").

The Mutual Arbitration Agreement's statement that "[b]y signing this Agreement, Employee acknowledges that he or she is knowingly and voluntarily waiving the right to file a lawsuit," [25-3] ¶ 7, also does not establish that signatures were required. This provision indicates only that Ryan's signature would "acknowledge[]" his waiver of the right to sue in court—it does not indicate that a signature was required for the Mutual Arbitration Agreement to become effective. Texas courts have held that similar language in contracts indicating that a signature functioned as an acknowledgment of the contract or contract's contents did not reflect the parties' intent to require signatures.[5] *See SK Plymouth*, 605 S.W.3d at 715–17 ("language preceding the signature lines in the Arbitration Agreement . . . stat[ing] that parties' signatures constituted an 'Acknowledgement of Receipt'" did not "indicate an intent by the parties to require [the employer] to sign the agreement to show its assent" but instead "evinces [the employer's] desire to ensure that it could demonstrate [the employee] had received notice of the agreement").

Because neither the text of the Mutual Arbitration Agreement nor the circumstances surrounding it show that the parties intended to require signatures, the parties could assent to the Agreement without signing it. The facts here are most similar to those in *Soni v. Solera Holdings, Inc.*, where the defendant

---

[5] Relatedly, the fact that the Mutual Arbitration Agreement includes a signature block is not enough on its own to be evidence of an intent to require the Agreement be signed. *Soni v. Solera Holdings, Inc.*, No. 3:20-cv-02925-M, 2021 WL 1726891, at *5 (N.D. Tex. Mar. 23, 2021) ("Texas courts have held that a signature block by itself is insufficient to establish the parties' intent to require signatures."); *SK Plymouth*, 605 S.W.3d at 716 ("[A] blank signature block alone does not establish that a signature is a condition precedent to the agreement's enforceability.").

employer had sent an employment offer letter to the plaintiff stating that "You and the Company shall execute the arbitration agreement set forth in Exhibit C." No. 3:20-cv-02925-M, 2021 WL 1726891, at *5 (N.D. Tex. Mar. 23, 2021). The arbitration agreement included a signature block and also "reference[d] the 'undersigned employer.'" *Id.* The court held "that the plain language of the arbitration agreement does not require a signature as a condition precedent to the agreement's enforceability." *Id.* And *In re Bunzl USA, Inc.*—the lone case cited by Plaintiffs on this issue—is distinguishable, because the court's conclusion that signatures were a condition precedent there turned on the fact that the contract included a provision that stated: "No modification or amendment of any provision of this Agreement is effective unless it is in writing *and signed by the parties to this Agreement*." 155 S.W.3d 202, 211 (Tex. App. 2004). The Mutual Arbitration Agreement contains no such provision. *See Wright*, 469 S.W.3d at 760 (distinguishing *Bunzl* on the basis that "the parties' agreement in the present case did *not* contain any provision expressly requiring that the agreement itself or any modifications to the agreement be signed by the parties").

Although the Mutual Arbitration Agreement need not be signed to be binding and enforceable, the present record is insufficient to determine whether both parties accepted the Mutual Arbitration Agreement. *See SK Plymouth*, 605 S.W.3d at 717 ("Even when there is no evidence to show that the parties intended the signing of the agreement to be a condition precedent, the evidence must still demonstrate that the non-signatory party intended to be bound by the agreement."). The complaint alleges that the parties accepted and entered into the Offer of Employment, [1] ¶¶ 37–38, but there are insufficient facts to resolve whether the parties (including Defendants) assented to be bound by the Mutual Arbitration Agreement.

Because of the incomplete factual record regarding the parties' acceptance of the Mutual Arbitration Agreement, the court cannot conclude at this time that Ryan is bound to arbitrate his claims. Further factual development is necessary to determine whether the parties assented to the Mutual Arbitration Agreement. Accordingly, the court stays Defendants' motion as to the arbitrability of Ryan's claims (except as to Ryan's claims regarding the promissory notes, addressed below) and whether his claims should be dismissed under Rules 12(b)(3) and 12(b)(6). The parties are ordered to file a joint status report by March 22, 2022 indicating how they intend to proceed, including (if necessary) a proposed schedule for discovery limited to the issue of whether Ryan has agreed to arbitrate his claims.

## B.     Ryan's and Tom's Claims Related to the Promissory Notes

Defendants also move under Rule 12(b)(3) to dismiss Ryan's and Tom's promissory estoppel, equitable estoppel, and fraudulent inducement claims to the extent they relate to the promissory notes signed by Ryan and Tom. [1] ¶¶ 187–90; 207–09, 211–13, 226–232, 297–298, 300, 304–05. Defendants argue that, because

the promissory notes contain arbitration clauses,[6] Plaintiffs' claims that relate to the notes must be dismissed. In response, Plaintiffs contend that these claims should not be dismissed because the complaint alleges Plaintiffs were fraudulently induced into agreeing to the promissory notes. Ryan and Tom do not dispute that their claims, to the extent they relate to the promissory notes, fall within the scope of the notes' arbitration clauses. Thus, the only issue is whether Ryan's and Tom's claims of fraudulent inducement enable them to avoid the notes' arbitration provisions.

The promissory notes' arbitration clauses mandate dismissal of Ryan's and Tom's claims to the extent they relate to the notes. Under the FAA, "a court may consider a claim that a contracting party was fraudulently induced to include an arbitration provision in the agreement but not claims that the entire contract was the product of fraud." *James v. McDonald's Corp.*, 417 F.3d 672, 680 (7th Cir. 2005) (internal quotation marks omitted); *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 449 (2006) ("[A] challenge to the validity of the contract as a whole, and not specifically to the arbitration clause, must go to the arbitrator."). Here, Ryan and Tom concede that they are alleging that the promissory notes—in their entirety—are the product of fraud; they do not argue or allege that there was any fraud specific to the notes' arbitration clauses. *See* [31] at 27 ("Plaintiffs seek a declaration that the notes are *wholly* invalid, including their arbitration clause." (emphasis added)); *see also* [1] ¶¶ 217–18, 228–29, 231–32, 304. The arbitration clauses are therefore enforceable, and all claims related to the notes are dismissed without prejudice. *See Johnson v. W. & S. Life Ins. Co.*, 598 F. App'x 454, 456 (7th Cir. 2015) ("[A] dismissal for improper venue is without prejudice because it is not an adjudication on the merits.").

## II.    Tom's Remaining Claims

Having addressed Defendants' arguments related to Rule 12(b)(3), the court now addresses Defendants' contention that Tom's remaining claims should be dismissed under Rule 12(b)(6).

### A.    Breach of Contract (Count IX)

Tom's breach of contract claim alleges that he had an oral employment contract to be "the head of Human Resources for AFV Partners and its other companies with an annual salary of $164,000, an annual bonus of $155,000, and a carried interest allocation with a value of at least $1.5 million, subject to future appreciation based on investment performance." [1] ¶¶ 237–38. Tom alleges AFV

---

[6] [1-3] ¶ 10 ("Any controversy, dispute or claim arising out of or relating to this Note, or its interpretation, application, implementation, breach or enforcement shall be settled by submission by either party of the controversy, claim or dispute to confidential and binding arbitration in Dallas, Texas . . . ."); [1-4] ¶ 10 (same); [1-5] ¶ 10 (same); [1-6] ¶ 10 (same).

Partners breached this agreement by "never pa[ying] any salary or bonuses to Tom and [because] Aquila failed to execute the Carried Interest Documents allocating any portion of the Carried Interest to Tom." *Id.* ¶¶ 242–44.

Defendants contend that Tom's breach of contract claim should be dismissed because his alleged oral employment contract is unenforceable due to lack of material terms and, even if it is enforceable, Tom has not alleged breach. Plaintiffs respond that Tom has alleged that he was offered a specific salary, bonus, and carried interest allocation, and that such compensation has not been paid in breach of the oral employment agreement.

As a threshold matter, the parties disagree on what law applies to Tom's claim. Defendants apply Illinois law. [25] at 21–22. Plaintiffs apply Texas law because the Offer of Employment (*i.e.*, the employment agreement sent to Ryan) has a Texas choice of law clause, [31] at 14 n.2, but also assert that "[n]o offer letter was ever tendered to Tom," *id.* at 17. Plaintiffs do not explain how a choice of law clause in a contract they allege Tom was never offered (and therefore never agreed to) could apply to his claims. Plaintiffs also assert that there is no material difference between Illinois and Texas law governing contract formation and substantive contract law, [31] at 14 n.2, and Defendants appear to agree, *see* [32] at 12 n.8. Accordingly, for purposes of this motion, the court applies Illinois law to Tom's breach of contract claim.

"Under Illinois law, to state a cause of action for breach of contract, a plaintiff must allege sufficient facts to establish four elements: (1) the existence of a valid and enforceable contract containing both definite and certain terms; (2) performance by the plaintiff; (3) breach of the contract by the defendant; and (4) injury to the plaintiff." *Ken-Pin, Inc. v. Vantage Bowling Corp.*, No. 02 C 7991, 2004 WL 783092, at *3 (N.D. Ill. Jan. 20, 2004). "[O]ral employment contracts are viewed more skeptically than written ones." *Zemke v. City of Chicago*, 100 F.3d 511, 513 (7th Cir. 1996); *Tolmie v. United Parcel Serv., Inc.*, 930 F.2d 579, 581 (7th Cir. 1991) (applying "more scrutinizing" analysis to oral employment contract on motion to dismiss). "To be enforceable, an oral contract must contain terms which are definite and certain." *Zemke*, 100 F.3d at 513. "Courts applying Illinois law properly dismiss complaints alleging the existence of an oral contract where the material terms of the alleged contract are vague, unclear, or indefinite." *Baxi v. Ennis Knupp & Assocs., Inc.*, No. 10-cv-6346, 2011 WL 3898034, at *8 (N.D. Ill. Sept. 2, 2011). "When the material terms and conditions are not ascertainable no enforceable contract is created. The court will not supply missing essential terms to an alleged contract." *Id.* (internal quotation marks omitted).

Tom has failed, in part, to plead the essential terms of his employment contract. The complaint's only allegations regarding the terms of the contract are that Tom was offered "a full-time position as the head of Human Resources for AFV Partners and its other companies" and that the contract was for "an annual salary

of $164,000, an annual bonus of $155,000, and a carried interest allocation with a value of approximately $1.5 million (subject to future appreciation based on investment performance) based on the [Heidrick & Struggles] report and methodology." [1] ¶ 93; *id.* ¶ 237 (similar). The promise of a $164,000 annual salary is sufficient to state an agreement for a set salary in return for work as the head of Human Resources, but the alleged oral contract is missing essential terms regarding the annual bonus and carried interest allocation. Specifically, Tom does not allege any details regarding when AFV Partners agreed to pay Tom the bonus and what (if any) conditions applied to the bonus payment (*e.g.*, whether Tom would receive the bonus if he worked less than a year and if the bonus was guaranteed or discretionary). The lack of details is even more apparent for the carried interest allocation, as Tom does not allege specific terms surrounding the allocation, including how it was to be calculated or when it was due to Tom.

Plaintiffs' response is similarly short on details. Plaintiffs assert only that "Defendants . . . ignore the allegations in support of Tom's breach of contract claim . . . that Aquila offered Tom an annual salary of $164,000, an annual bonus of $155,000, and a carried interest allocation with a value of approximately $1.5 million." [31] at 17. Plaintiffs do not explain how these allegations state all the essential terms for an agreement to pay a bonus and entitlement to a carried interest allocation, and they do not cite any legal authority to show that the terms alleged in the complaint are adequate to state a claim for breach of an oral employment contract regarding these matters. Accordingly, the alleged agreement concerning Tom's bonus and carried interest is "vague, unclear, [and] indefinite," and is unenforceable. *Baxi*, 2011 WL 3898034, at *8.

For the same reasons, Tom also has not alleged breach of the oral employment contract regarding the bonus and carried interest provisions. Tom alleges that he was promised an "annual bonus," [1] ¶ 93, but also alleges he was only employed for approximately six months, *id.* ¶¶ 95, 99 ("Tom began his employment with AFV Partners effective November 25, 2019" and was "terminated" "on June 2, 2020"). Although Tom makes the conclusory allegation that "[t]he failure of AFV Partners to pay Tom his . . . bonus pursuant to his employment contract constitutes a breach of contract," *id.* ¶ 243, the lack of any details surrounding the terms of the "annual" bonus makes it impossible to determine whether AFV Partners owed Tom the bonus at the time of his termination six months after his employment began and whether AFV Partners' failure to pay the bonus was therefore a breach.

So too for the carried interest allocation. Tom makes the conclusory allegation that "the failure of Aquila to execute the Carried Interest Documents and the failure of AFV Partners to contribute Tom's . . . share of the carried interest to FSCP Co-Investment I constitutes a breach of his employment contract," *id.* ¶ 244, but the complaint does not allege that the oral employment agreement imposed any obligation on Aquila to execute such documents or on AFV Partners to contribute to

15

FSCP Co-Investment I. These allegations, without additional underlying factual details, are insufficient to state a claim for breach. *See Indus. Hard Chrome Ltd. V. Hetran, Inc.*, 64 F. Supp. 2d 741, 745 (N.D. Ill. 1999) ("It is insufficient for the plaintiffs to make a conclusory allegation; rather, plaintiff must state the facts underlying the breach."); *Immediate Merchant Servs., Inc. v. Bankcard Am., Inc.*, No. 94 C 557, 1994 WL 643272, at *6 (N.D. Ill. Nov. 10, 1994) ("Counter-Plaintiffs' bald statement that IMS breached the contract is a conclusory legal allegation and will not be credited by this Court."). And, again, Plaintiffs offer no substantive rebuttal of Defendants' argument on this point.

Whether Plaintiffs have stated a claim for breach of the salary provision is a closer question, but the complaint alleges enough factual detail for the court to reasonably infer a breach. The complaint alleges that Tom was owed "an annual salary of $164,000" and that "AFV Partners never paid any salary . . . to Tom." [1] ¶¶ 93, 98. Defendants contend that the complaint's allegation that Tom was ultimately paid $55,786 (after taxes) shortly after his termination "refute[s] the[] breach claim[] regarding failure to pay salary." [32] at 10 (citing [1] ¶ 101). Although Defendants' argument is facially plausible—and Plaintiffs offer no rebuttal—taking all reasonable inferences in favor of Plaintiffs (as the court must at this stage), it can reasonably be inferred that the $55,786 is not the full amount of salary owed by AFV Partners to Tom for the time he worked there. This is enough to state a claim for breach of the salary provision in Tom's oral employment agreement.

Accordingly, with respect to Tom's claims, the complaint does not state a claim for breach of the oral employment agreement regarding the annual bonus and carried interest allocation, but does state a claim for breach regarding the failure to pay salary.

## B.    Illinois Wage Payment and Collection Act (Count X)

Tom alleges that Aquila and AFV Partners violated the Illinois Wage Payment and Collection Act ("IWPCA"), 820 ILCS 115/1, *et seq.*, by failing to pay Tom the salary, bonus, and value of carried interest. [1] ¶¶ 251–62.

Defendants argue that Tom's claim should be dismissed because neither Aquila nor AFV Partners is an Illinois employer and the complaint does not allege that Tom is owed any "earned" compensation as defined by the IWPCA. Plaintiffs contend that the IWPCA applies to even out-of-state employers so long as they have sufficient contacts with Illinois and that Tom's unpaid salary, bonuses, and other compensation are covered under the IWPCA.

"To state a claim under the [IWPCA], a plaintiff must plead that (1) he had an employment agreement with the employer that required the payment of wages or final compensation and (2) that the defendants were employers under the

[IWPCA]." *Watts v. ADDO Mgmt., LLC*, 2018 IL App (1st) 170201, ¶ 14. The IWPCA "applies to all employers and employees in this State [Illinois] . . . excepting employees of the State or Federal governments." 820 ILCS 115/1. Although the IWPCA does not define what it means to be an "employer[] . . . in [Illinois]," Illinois state courts have recognized that state agency "regulations make clear that the Wage Act can apply to out-of-state employers, where the work is performed in Illinois and the employer has 'sufficient contacts in the State.'" *Watts*, 2018 IL App (1st) 170201, ¶ 26 (quoting 56 Ill. Adm. Code 300.440(c) (2014)). So, for example, the IWCPA applies to an employer with an out-of-state headquarters where the employee "performed work in Illinois" and the out-of-state employer "was physically present in Illinois," often directed the employee's work in Illinois, and regularly did business in Illinois. *Id.* ¶ 27.

Plaintiffs do not dispute that AFV Partners and Aquila are out-of-state employers for purposes of the IWPCA. AFV Partners is not an Illinois company; it is an LLC "formed under the laws of the State of Delaware, with its principal place of business . . . [in] Argyle, Texas." [1] ¶ 9. And Aquila "is a resident of the State of Texas and resides . . . [in] Southlake, Texas." *Id.* ¶ 7.

Accordingly, for the IWPCA to apply, Tom must allege that his "work [was] performed in Illinois and [AFV Partners and Aquila] ha[d] sufficient contacts in the State." *Watts*, 2018 IL App 170201, ¶ 26 (internal quotation marks omitted). Tom has not done so, as the complaint does not allege that he performed any work for AFV Partners and Aquila in Illinois or that he was an Illinois resident when he worked for them. Tom alleges that, at the time the complaint was filed on August 7, 2020, he was "a resident of the State of Illinois." *Id.* ¶ 6. But Tom alleges he was "terminated" on June 2, 2020, before the complaint was filed, *id.* ¶ 257, and Tom does not allege that he was an Illinois resident while working for Aquila or AFV Partners. Similarly, although Tom alleges that he performed significant work for AFV Partners and Aquila, he does not allege that any of this work took place in Illinois.[7] *See, e.g.*, *id.* ¶¶ 95, 98, 252, 256. At best, the complaint alleges that "a substantial part of the events on which the claims asserted herein occurred in this District and the subject employment contracts were entered into in the Northern District of Illinois." *Id.* ¶ 21. But the fact that Tom entered into the alleged contract in Illinois does not also mean he performed his work here, and the remainder of the allegation is too conclusory to be credited—particularly given that the allegation is also addressing Ryan's claims, and Ryan allegedly performed his

_____

[7] Plaintiffs also argue that they "can easily establish that post-termination payments received by . . . Tom alleged in the complaint were both subject to Illinois withholding," [31] at 19 n.3 (citing [1] ¶¶ 136, 266), but the allegations cited by Plaintiffs in support say nothing about whether Tom performed any work in Illinois.

work in Illinois.[8]  Plaintiffs argue that whether AFV Partners and Aquila are covered by the IWPCA is a question of fact, but the complaint contains no factual allegations from which it could be reasonably inferred that Tom performed any work in Illinois or was an Illinois resident at the time he was employed by AFV Partners and Aquila.  Because AFV Partners and Aquila are out-of-state employers, Tom has not stated a claim for violation of the IWPCA.  *See Cilliers v. Cobalt Holdings, Inc.*, No. 18 C 2428, 2019 WL 1514977, at *3 (N.D. Ill. Apr. 8, 2019) ("Because plaintiffs do not allege that they are residents of Illinois or performed any work here, they have not stated viable IWPCA claims."); *cf. Yates v. BDJ Trucking Co.*, No. 17-cv-3503, 2018 WL 3303290, at *5 (N.D. Ill. July 5, 2018) (denying motion to dismiss because the plaintiffs "allege[d] that they performed work in Illinois"); *Watts*, 2018 IL App (1st) 170201, ¶ 27 (similar).

Separately, Tom does not state an IWPCA claim based on AFV Partners' and Aquila's failure to pay the annual bonus and carried interest because Tom has not alleged an enforceable contract entitling him to such compensation.  "[T]o state a claim under the IWPCA, [plaintiffs] are required to demonstrate that they are owed compensation from defendants pursuant to an employment agreement."  *Enger v. Chi. Carriage Cab Corp.*, 812 F.3d 565, 569 (7th Cir. 2016); *Hoffman v. RoadLink Workforce Sols., LLC*, No. 12 C 7323, 2014 WL 3808938, at *4 (N.D. Ill. Aug. 1, 2014) ("[T]he IWPCA mandates payment of wages only to the extent the parties' contract or employment agreement requires such payment.").  As explained above regarding Tom's breach of contract claim, Tom has not adequately alleged an enforceable contract that entitles him to the annual bonus and carried interest allocation.  Thus, Tom also has not stated a claim under the IWPCA for the annual bonus and carried interest because he has not adequately alleged that he is owed such compensation pursuant to an employment contract.  *See Hoffman*, 2014 WL 3808938, at *5 (granting motion to dismiss IWPCA claims where plaintiffs did not "allege the wage terms of their contract" and did not "adequately allege that they had any agreement with Defendants requiring Defendants to compensate them").

Tom's IWPCA claim is dismissed without prejudice.

## C.  Promissory Estoppel (Count XI) and Equitable Estoppel (Count XIV)

Tom's promissory estoppel claim alleges that "Aquila, individually and on behalf of AFV Partners made an unambiguous promise to Tom Aprill to hire him as the head of Human Resources for AFV Partners and its other companies with an annual salary of $164,000, an annual bonus of $155,000, and a carried interest allocation with a value of at least $1.5 million."  [1] ¶ 266.  Tom alleges he reasonably relied on that promise, resigned from DHR International, and began

---

[8] [1] ¶ 41 ("Ryan commenced his formal employment with AFV Partners and established a home office in Chicago, Illinois which became his primary workplace.").

18

working for AFV Partners. *Id.* ¶¶ 267–69. Tom alleges that, despite their earlier promises, "Aquila and AFV Partners have refused . . . to compensate him in any way for his efforts." *Id.* ¶ 270. Tom's equitable estoppel claim alleges essentially the same but also alleges that the promises regarding compensation were "false representations designed to induce Tom to resign from his employment at DHR International" and that "Aquila knew they were false when he made them as neither Aquila nor AFV Partners ever intended to pay Tom his salary and bonus, and Aquila never intended to grant Tom any share of the carried interest." *Id.* ¶¶ 293–94.

Defendants assert that Tom's promissory estoppel and equitable estoppel claims should be dismissed because the equitable estoppel claim relies on misrepresentations regarding promised future actions and not existing facts, there was no unambiguous promise of carried interest or a bonus for the promissory estoppel claim, and, for both claims, the complaint does not allege reasonable reliance or reliance damages. The parties agree that Illinois law governs both claims. [25] at 24 n.14; [31] at 14 n.2.

"To establish a claim of promissory estoppel, the plaintiff must prove that (1) defendant made an unambiguous promise to plaintiff, (2) plaintiff relied on such promise, (3) plaintiff's reliance was expected and foreseeable by defendants, and (4) plaintiff relied on the promise to its detriment." *First Mercury Ins. Co. v. Ciolino*, 2018 IL App (1st) 171532, ¶ 49 (internal quotation marks omitted).

The elements of equitable estoppel are:

(1) the other person misrepresented or concealed material facts; (2) the other person knew at the time he or she made the representations that they were untrue; (3) the party claiming estoppel did not know that the representations were untrue when they were made and when they were acted upon; (4) the other person intended or reasonably expected that the party claiming estoppel would act upon the representations; (5) the party claiming estoppel reasonably relied upon the representations in good faith to his or her detriment; and (6) the party claiming estoppel would be prejudiced by his or her reliance on the representations if the other person is permitted to deny the truth thereof.

*Id.* ¶ 52 (internal quotation marks omitted).

As a threshold matter, because Tom's claims are dismissed without prejudice to the extent that they relate to the promissory notes, the analysis here addresses only the claims' allegations regarding misrepresentations made regarding Tom leaving his former employer, *e.g.*, [1] ¶¶ 266–73, 293–96, 301–304, not the allegations concerning the promissory notes.

19

Tom's allegations do not state a claim for equitable estoppel. An equitable estoppel claim can only be based on "misrepresentations of existing fact" and not "promises of future action." *Promero, Inc. v. Mammen*, No. 02 C 1191, 2002 WL 31455970, at *9 (N.D. Ill. Nov. 1, 2002); *Matthews v. Chi. Transit Auth.*, 2016 IL 117638, ¶ 94 n.11. Here, the only misrepresentations identified by Tom are promises of future payment that cannot form the basis for equitable estoppel. [1] ¶¶ 93, 293, 303; *see Promero*, 2002 WL 31455970, at *9 (dismissing equitable estoppel claim). Further, Plaintiffs do not point to any alleged misrepresentation of existing fact in the complaint.

Tom also does not state a claim for promissory estoppel regarding the annual bonus payment and carried interest. The complaint makes the conclusory assertion that Aquila made an "unambiguous promise" to pay Tom an annual bonus along with a carried interest allocation. [1] ¶ 266. However, there are no factual details alleged regarding Aquila's alleged promise, including (as discussed above) whether such compensation was guaranteed and whether Tom would receive it even if he worked for less than a year. *See Sembos v. Philips Components*, 376 F.3d 696, 704–5 (7th Cir. 2004) ("alleged promises [of employment] were too indefinite, as a matter of law, to constitute unambiguous promises" where promises did not include specific "terms of employment"). The court does not address whether Tom's reliance on these alleged promises was reasonable.

Defendants do not, however, challenge Tom's promised salary as being too ambiguous or argue that promise was unreliable. [25] at 24–25. The only argument Defendants make is that Tom may only recover reliance damages. However, the sole authority Defendants cite for the proposition that reliance damages are the only available remedy for a promissory estoppel claim is a non-precedential opinion that says no such thing. *See DeSanto v. Centerpoint Props. Tr.*, 2011 IL App (1st) 103035-U. And some federal courts have concluded that, although the availability of expectation damages is an open question under Illinois law, Illinois courts would allow a plaintiff to seek expectation damages for promissory estoppel. *See Dugas-Filippi v. JP Morgan Chase & Co.*, 971 F. Supp. 2d 802, 804–6 (N.D. Ill. 2013) (surveying Illinois law and concluding that it "does not foreclose Plaintiffs from pursuing [expectation damages] as part of their promissory estoppel claim").

Accordingly, with respect to Tom's claims, the complaint does not state claims for equitable estoppel and promissory estoppel based on misrepresentations regarding the bonus and carried interest allocation. The complaint does, however, adequately allege a promissory estoppel claim based on misrepresentations regarding payment of salary.

### D.    Fraudulent Inducement (Count XIII)

Tom's fraudulent inducement claim alleges that "Aquila, individually and on behalf of AFV Partners knowingly and intentionally made . . . false representations designed to induce Tom to resign from his employment at DHR International and began [*sic*] working for AFV Partners" regarding the salary, bonus, and carried interest he would receive working for AFV Partners. *Id.* ¶ 284.

Defendants move to dismiss Tom's claim because the complaint alleges only that Defendants failed to follow through on promises of future action (payment for Tom's services), which is not actionable under Illinois law,[9] and Tom's reliance was not justified. Plaintiffs argue that Tom has adequately alleged a scheme to defraud—an exception to the Illinois rule prohibiting fraud based on promises of future conduct.

Federal Rule of Civil Procedure 9(b) requires that "a party . . . state with particularity the circumstances constituting fraud." "While the precise level of particularity required under Rule 9(b) depends upon the facts of the case, the pleading ordinarily requires describing the who, what, when, where, and how of the fraud." *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 737 (7th Cir. 2014) (internal quotation marks omitted). "The elements of common-law fraud in Illinois are: (1) a false statement of material fact; (2) knowledge or belief by the maker that the statement was false; (3) an intention to induce the plaintiff to act; (4) reasonable reliance upon the truth of the statement by the plaintiff; and (5) damage to the plaintiff resulting from this reliance." *Am. Kitchen Delights, Inc. v. Nat'l R.R. Passenger Corp.*, No. 13-CV-4010, 2013 WL 6713776, at *2 (N.D. Ill. Dec. 19, 2013) (citing *Lagen v. Balcor Co.*, 274 Ill. App. 3d 11, 17 (1995)).

"In the usual case of fraud under Illinois law, 'the fraudulent statement must relate to a past or present fact. A statement which is merely an expression of opinion or which relates to future or contingent events, expectations, or probabilities ordinarily does not constitute an actionable misrepresentation.'" *Rosenblum v. Travelbyus.com, Ltd.*, No. 01 C 6441, 2002 WL 31487823, at *3 (N.D. Ill. Nov. 6, 2002) (quoting *Razdan v. Gen. Motors Corp.*, 979 F. Supp. 755, 759 (N.D. Ill. 1997)). Illinois does, however, recognize an exception for "promissory fraud, where 'a false promise of future conduct is the scheme or device to accomplish the fraud.'" *Id.* (quoting *Razdan*, 979 F. Supp. at 759). "The scheme exception applies where 'a party makes a promise of performance, not intending to keep the promise but intending for another party to rely on it, and where the other party relies on it to his detriment.'" *Bower v. Jones*, 978 F.2d 1004, 1011 (7th Cir. 1992) (quoting *Concord Indus., Inc. v. Marvel Indus. Corp.*, 122 Ill. App. 3d 845, 849–50 (1984)).

---

[9] Both parties apply Illinois law to Tom's claim and do not identify any material differences between Texas and Illinois law, [25] at 28 n.16; [32] at 27 n.5, so the court applies Illinois law.

"Mere assertions that the defendant had no intention of keeping its promise are insufficient to state a claim for promissory fraud." *Brdecka v. Gleaner Life Ins. Soc'y*, No. 02 C 3076, 2002 WL 1949743, at *3 (N.D. Ill. Aug. 23, 2002).

Plaintiffs do not dispute that Tom does not allege any material misrepresentation of then-existing fact, so his fraudulent inducement claim survives only if he has adequately alleged a scheme to defraud. *Bower*, 978 F.2d at 1011. The complaint's conclusory allegations, however, do not allege such a scheme, as the complaint does not contain specific factual allegations sufficient to infer any misrepresentations were made with fraudulent intent. At best, the complaint alleges that Aquila "knowingly and intentionally made false representations designed to induce Tom" to join AFV Partners and that "neither Aquila nor AFV Partners ever intended to pay Tom his salary and bonus, and Aquila never intended to grant Tom any share of the carried interest." [1] ¶¶ 284–85; *see also id.* ¶ 286 (alleging Aquila "never intended to pay Tom the compensation he was promised"). Aside from these conclusory assertions, the complaint alleges no facts from which it could be inferred that Aquila or AFV Partners intended to defraud Tom at the time Tom was allegedly promised compensation. The scheme exception therefore does not apply and Tom's fraudulent inducement claim is dismissed without prejudice. *Rosenblum*, 2002 WL 31487823, at *3 ("Rosenblum's allegations that defendants never intended to keep their promises are not supported with specific and objective manifestations of fraudulent intent. Accordingly, Count II must be dismissed."); *Ault v. C.C. Servs., Inc.*, 232 Ill. App. 3d 269, 272–73 (1992); *see also Bower*, 978 F.2d at 1012 ("In order to survive the pleading stage, a claimant must be able to point to specific, objective manifestations of fraudulent intent." (quoting *Hollymatic Corp. v. Holly Sys., Inc.*, 620 F. Supp. 1366, 1369 (N.D. Ill. 1985))). The court does not address whether Tom's reliance was justified under the circumstances.

## E. Unjust Enrichment (Count XII)

Tom's unjust enrichment claim alleges that "Tom began performing services for Aquila and AFV Partners on or about November 25, 2019 and worked on average over 80 hours per week attempting to fill the human resource and staffing needs of AFV Partners and its related companies." [1] ¶ 275. Tom alleges that he "had a reasonable expectation of being compensated for his services" but "Aquila and AFV Partners received and retained the benefit of Tom's services without paying for" them. *Id.* ¶¶ 278–79.

Defendants contend that Tom's unjust enrichment claim should be dismissed because neither Texas nor Illinois recognizes unjust enrichment as an independent cause of action and, even if they do, Tom has not alleged that the payment for his services after his termination did not fully compensate him. The parties apply both Illinois and Texas law in their briefing, although they agree that Illinois law governs and that there is no relevant conflict between Illinois and Texas law. [24] at 24 n.14; [31] at 14 n.2. The court applies Illinois law.

22

Although the case law on this issue is muddled, the court concludes that a cause of action for unjust enrichment exists under Illinois law but relies upon Tom stating a separate viable claim. Binding Seventh Circuit precedent holds that "[u]njust enrichment does not constitute an independent cause of action. Rather, it is a condition that may be brought about by unlawful or improper conduct as defined by law, such as fraud, duress or undue influence, or, alternatively, it may be based on contracts which are implied in law." *Toulon v. Cont'l Cas. Co.*, 877 F.3d 725, 741 (7th Cir. 2017) (internal quotation marks omitted). This means that an unjust enrichment claim is effectively "tied to the fate" of another claim alleging improper conduct or an implied contract. *Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 648 (7th Cir. 2019) (internal quotation marks omitted); *Nat'l Cas. Co. v. White Mountains Reinsurance Co. of Am.*, 735 F.3d 549, 569–60 (7th Cir. 2013). Because Tom has stated a promissory estoppel claim to recover his alleged promised salary (if there is no express employment contract), he also has a claim for unjust enrichment. *Cf. Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 740 (7th Cir. 2019) ("request for relief based on unjust enrichment" could proceed because plaintiff stated a claim for fraud).

The complaint also adequately alleges that Aquila and AFV Partners were unjustly enriched. Tom allegedly received only the "net amount of $55,786" for his work despite "[t]he reasonable value of Tom's services exceed[ing] $1,750,000." [1] ¶¶ 260, 282. Accepted as true, the complaint adequately alleges that Aquila and AFV Partners were unjustly enriched by approximately $1.7 million by failing to pay Tom reasonable compensation.

Defendants' motion to dismiss is denied with respect to Tom's unjust enrichment claim.

## F. Claims Against Aquila in His Individual Capacity (Counts X–XIV)

Defendants also assert that Tom's claims brought against Aquila in his personal capacity should be dismissed because Aquila was acting as an agent for AFV Partners or FSCP Co-Investment I and Plaintiffs have not pled facts adequate to pierce the corporate veil and hold Aquila personally liable. Plaintiffs respond that piercing the veil is justified because the complaint alleges that Aquila and the corporate entities were engaged in fraud. Because this case is before the court on the basis of diversity jurisdiction and AFV Partners and FSCP Co-Investment I are incorporated in Delaware, Delaware law applies to this issue.[10] *Eagle Air*

---

[10] Plaintiffs contend that Texas law applies to whether veil-piercing is justified for AF Ventures because AF Ventures is incorporated in Texas. Tom, however, does not bring any claims against AF Ventures and does not base any of his claims on Aquila acting as an agent for AF Ventures. *See* [1] ¶¶ 263, 266, 275, 284, 293 (alleging Aquila was acting on behalf of AFV Partners).

*Transport, Inc. v. Nat'l Aerotech Aviation Del., Inc.*, 75 F. Supp. 3d 883, 895 (N.D. Ill. 2014).

Under Delaware law, courts "will disregard the corporate form only in the exceptional case." *Winner Acceptance Corp. v. Return on Capital Corp.*, No. 3088–VCP, 2008 WL 5352063, at *5 (Del. Ch. Dec. 23, 2008) (internal quotation marks omitted). "To state a 'veil-piercing claim,' the plaintiff must plead facts supporting an inference that the corporation, through its alter-ego, has created a sham entity designed to defraud investors and creditors." *Eagle Air Transport*, 75 F. Supp. 3d at 896 (quoting *Crosse v. BCBSD, Inc.*, 836 A.2d 492, 496 (Del. 2003)). Factors in this analysis include: "(1) whether the company was adequately capitalized for the undertaking; (2) whether the company was solvent; (3) whether corporate formalities were observed; (4) whether the controlling shareholder siphoned company funds; or (5) whether, in general, the company simply functioned as a facade for the controlling shareholder." *Winner Acceptance*, 2008 WL 5352063, at *5.

Tom has not alleged facts sufficient to justify piercing the corporate veil of AFV Partners or FSCP Co-Investment I and holding Aquila personally liable. The complaint's allegations that touch upon the above factors are that: (1) Aquila was "the President and Managing Member of AFV Partners," [1] ¶ 27; (2) Aquila "used a portion of the initial capital contributed by other investors for his own personal benefit, including repairing and operating his Gulfstream jet" and AFV Partners paid for jet-related expenses, *id.* ¶¶ 46, 72; (3) Aquila directed some employees of Aircraft Performance Group, a company acquired by AFV Partners, to work on his personal real estate investments, *id.* ¶ 66; and (4) AFV Partners failed to pay vendors, deferred compensation for employees, and did not fully compensate Plaintiffs, *id.* ¶¶ 67, 79, 98. There are no such allegations regarding Aquila and FSCP Co-Investment I.

These allegations are insufficient to establish that AFV Partners or FSCP Co-Investment I was a "sham and exist[ed] for no other purpose than as a vehicle for fraud." *In re Sunstates Corp. Shareholder Litig.*, 788 A.2d 530, 534 (Del. Ch. 2001) (internal quotation marks omitted). The complaint's allegations indicate that Aquila had some power over AFV Partners given his position but does not allege that he exercised total control of the company such that AFV Partners was a mere facade or that he was the company's alter ego. Similarly, the complaint alleges that Aquila misused some funds and resources for his personal benefit, yet Plaintiffs do not allege that AFV Partners was undercapitalized, insolvent, or that corporate formalities were not observed. The complaint also establishes that AFV Partners was a legitimate business. AFV Partners had a "business plan . . . to raise money . . . to invest in dynamic technology businesses." *Id.* ¶ 24. In fact, AFV Partners is alleged to have been a successful business, raising investment funds from different sources and investing in or acquiring multiple companies that resulted in AFV Partners having investment interests worth as much as $250 million. *Id.* ¶¶ 42, 47,

54, 62, 65, 71; *see also id* ¶ 82 (summarizing AFV Partners' success). Altogether, the complaint does not state sufficient facts to pierce the corporate veil and hold Aquila personally liable.[11] *See Sunstates Corp. Shareholder Litig.*, 788 A.2d at 534 (finding "no basis" to pierce the corporate veil where "entities [were] engaged in substantial business operations"); *cf. Gadsden v. Home Pres. Co.*, No. Civ. A. 18888, 2004 WL 485468, at *4–5 (Del. Ch. Feb. 20, 2004) (piercing the veil where "[f]rom its inception, and by design, Home Preservation never had any economic worth," "was never capitalized with any funds," never "own[ed] any assets," and the "sole stockholder and employee" would "transfer[] any excess cash from the company to his personal accounts"); *Morris v. Mergenthaler*, No. Civ. A. 5962, 1980 WL 268072, at *2 (Del. Ch. Oct. 14, 1980) (disregarding corporate form where complaint alleged defendant corporation's assets had been fraudulently conveyed from another corporation for sole purpose of avoiding paying court judgment).

Tom's claims against Aquila in his individual capacity are dismissed without prejudice.

## III. Motion to Strike

Finally, Defendants move under Federal Rule of Civil Procedure 12(f) to strike allegations from the complaint that they argue are irrelevant or scandalous, as well as the requests for attorneys' fees for Tom's common law claims. Under Rule 12(f), "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." "Motions to strike 'are generally disfavored because they potentially only delay the proceedings.'" *Siegel v. HSBC Holdings, PLC*, 283 F. Supp. 3d 722, 730 (N.D. Ill. 2017) (quoting *Edwards v. Mack Trucks, Inc.*, 310 F.R.D. 382, 386 (N.D. Ill. 2015)). "Allegations may be stricken as scandalous if the matter bears no possible relation to the controversy or may cause the objecting party prejudice." *Talbot v. Robert Matthews Distrib. Co.*, 961 F.2d 654, 664 (7th Cir. 1992). The court "has considerable discretion in striking any redundant, immaterial, impertinent or scandalous matter." *Delta Consulting Grp., Inc. v. R. Randle Constr., Inc.*, 554 F.3d 1133, 1141 (7th Cir. 2009). Although not strictly required by Rule 12(f), "motions to strike are frequently denied when no prejudice could result from the challenged allegations, even though the matter literally is within the category set forth in Rule 12(f)." *Anderson v. Bd. of Educ. of City of Chi.*, 169 F. Supp. 2d 864, 868 (N.D. Ill. 2001) (internal quotation marks omitted); *Siegel*, 283 F. Supp. 3d at 730.

Defendants' request to strike certain allegations as scandalous, irrelevant, or defamatory is denied. The allegations Defendants seek to strike, identified in [25-4], are facially relevant to Plaintiffs' fraud claims, as well as Plaintiffs' attempt

---

[11] Plaintiffs also argue that Aquila is subject to individual liability under the IWPCA. Because the IWPCA claim as to Tom is dismissed, the court does not address the merits of this argument.

to pierce the corporate veil and hold Aquila individually liable.  Although the court has dismissed some of these claims as to Tom, the court has not addressed the merits of Ryan's claims pending the determination of whether Ryan's claims must be resolved through arbitration and declines to dismiss any allegations relevant to his claims as irrelevant or baseless before that determination is made.  Defendants also have not carried their burden to show that the allegations are factually baseless or prejudicial.  *Siegel*, 283 F. Supp. 3d at 730.  Defendants make conclusory arguments on these issues in their briefs and offer no facts to support either contention.  In this procedural posture and on this record, the court declines to strike any of the complaint's allegations.

Defendants' motion is also denied with respect to Tom's request[12] for attorneys' fees.  "Illinois generally recognizes the American Rule that, absent a statute or contractual provision, a successful litigant must bear the burden of his or her own attorney's fees."  *Fednav Int'l Ltd. v. Cont'l Ins. Co.*, 624 F.3d 834, 839 (7th Cir. 2010) (internal quotation marks omitted).  Plaintiffs have identified potential statutes that could apply, such as 705 ILCS 225/1 and Section 38.001 of the Texas Civil Practice & Remedies Code.  Defendants contend that Tom did not satisfy the requirements to receive attorneys' fees under 705 ILCS 225/1 and that Texas law does not apply because awarding fees is usually a matter of procedure, not substance.  *Zapata Hermanos Sucesores, S.A. v. Hearthside Baking Co.*, 313 F.3d 385, 388 (7th Cir. 2002).  But, because these issues are not well-developed in the briefs and this litigation has not yet progressed past the motion to dismiss stage, "it would be premature" to strike Tom's requests for attorney's fees.  *See FDIC v. Masarsky*, 968 F. Supp. 2d 915, 931 (N.D. Ill. 2013).  Defendants are free to raise these arguments again after the facts are fully developed.  The court does not reach these issues at this stage.

Defendants' motion to strike is denied.

## CONCLUSION

Defendants' motion is granted in part, denied in part, and stayed in part.  Plaintiffs' claims related to the promissory notes are dismissed without prejudice under Rule 12(b)(3).  With respect to Ryan's remaining claims, the motion is stayed for further factual development of whether the claims are subject to arbitration.  The motion as it relates to dismissing Ryan's claims under Rule 12(b)(6) is also stayed.  Under Rule 12(b)(6), Tom has stated a breach of contract claim based on failure to pay Tom's agreed-upon salary but not the alleged failure to pay him an annual bonus or allocate to him carried interest.  Tom also does not state a promissory estoppel claim based on representations regarding a bonus and carried interest, but his claim may proceed as it relates to his salary.  Defendants' motion to

---

[12] The motion to strike, as it pertains to Ryan's claims, is stayed pending determination of whether his claims are subject to arbitration or should be dismissed under Rule 12(b)(6).

dismiss is denied with respect to Tom's unjust enrichment claim. Tom's IWPCA, equitable estoppel, and fraudulent inducement claims are dismissed without prejudice. All of Tom's claims against Aquila in his personal capacity are dismissed without prejudice. Defendants' request to strike under Rule 12(f) is denied.

Dated: March 1, 2022                    /s/ Martha M. Pacold